195 N.J. Super. 493 (1984)
480 A.2d 927
LEE'S HAWAIIAN ISLANDERS, INC., PLAINTIFF-RESPONDENT,
v.
SAFETY FIRST PRODUCTS, INC., DEFENDANT-APPELLANT, AND CHEMETRON FIRE SYSTEMS, DIVISION OF THE CHEMETRON CORPORATION, DEFENDANT-RESPONDENT, AND SAFETY FIRST PRODUCTS, INC., DEFENDANT AND THIRD PARTY PLAINTIFF-APPELLANT,
v.
PITCO., INC., THIRD PARTY DEFENDANT AND CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 12, 1984.
Decided July 31, 1984.
*496 Before Judges BOTTER and PRESSLER.
George R. Hardin argued the cause for appellant (Bumgardner, Hardin & Ellis, attorneys; George R. Hardin, of counsel; Mark S. Kundla, on the brief).
Murray R. Miller argued the cause for cross-appellant (Bennett & Bennett, attorneys; Murray R. Miller, on the brief).
Richard A. Tanner argued the cause for respondent Lee's Hawaiian Islander, Inc. (Haggerty & Donohue, attorneys; Richard A. Tanner, of counsel and on the brief).
*497 Mark L. Antin argued the cause for respondent Chemetron Fire Systems (Gennet and Kallmann, attorneys; Mark L. Antin, on the brief).
The opinion of the court was delivered by PRESSLER, J.A.D.
This is an appeal in a multi-issue, multi-party products liability case having its genesis in a kitchen fire which occurred at a restaurant owned and operated by plaintiff Lee's Hawaiian Islanders, Inc. (Lee's). The fire damage which Lee's sustained was allegedly caused by defects in two distinct and separate products. The first was a deep fat fryer manufactured by third-party defendant Pitco., Inc., which, because of an alleged safety device failure, caused the oil to reach its combustion point and ignite. The second was an automatic fire suppression system designed and manufactured by defendant Chemetron Fire Systems (Chemetron) and installed by defendant Safety First Products, Inc. (Safety First). It is alleged that the fire suppression system failed to operate properly and therefore failed to extinguish or reasonably contain the fire caused by the igniting oil. Ultimately, Safety First and Pitco were held liable, and both appeal.
The issues raised on appeal can best be understood in the context of the procedural history of the litigation. Lee's initially instituted this action against Safety First only, alleging negligence, breach of warranty, and strict liability in tort.[1] Safety First then filed two separate third-party complaints, one against Chemetron and the other against Pitco, each of which sought contribution or, in the alternative, indemnification from the third-party defendants. Lee's amended its complaint to assert an affirmative claim against Chemetron but did not do so *498 as against Pitco. Pitco's liability, therefore, was limited to Safety First's claim for indemnification or contribution.
Prior to trial, Chemetron moved for summary judgment dismissing all affirmative claims made against it. Its contention was that no facts of record supported the inference that there was either a design or a manufacturing defect in the system. This motion was granted, and trial proceeded against Safety First and Pitco. Following the close of all of the evidence and after Safety First's unsuccessful motion for dismissal of the complaint, plaintiff moved for a directed verdict against Safety First. This motion was granted, and partial judgment was entered in plaintiff's favor for that portion of the damages which had been stipulated, namely, the damage to the building and the kitchen equipment in the amount of $56,408. Two questions were then submitted to the jury. The first was the amount, if any, of the balance of plaintiff's damages, which it sought on the basis of loss of profits, the value of food destroyed or rendered unusable by the fire, and the cost of other work that had to be done in the restaurant in order for plaintiff to resume its operation. The second question submitted to the jury was whether there was a defect in Pitco's fryer which was also a proximate cause of the fire. The jury returned a verdict finding that the balance of Lee's damages was $103,000 and holding Pitco liable for manufacturing a defective product. The trial judge awarded prejudgment interest pursuant to R. 4:42-11(b) on the total damages of $169,408, for a total award to plaintiff of $200,854. Having denied Safety First's request that the jury allocate percentages of negligence as between it and Pitco, the judge then divided the verdict in half, holding that Safety First and Pitco were joint tortfeasors equally responsible for the payment of the total award and each entitled to pro rata contribution from the other. Both Safety First and Pitco unsuccessfully moved for a new trial or, in the alternative, for a remittitur, and both appeal from the pretrial summary judgment in favor of Chemetron, *499 from the jury verdict, from the directed verdict against Safety First, and from the denial of their post-trial motions.
The questions before us implicate both damages and liability issues. The liability issues are, first, whether summary judgment dismissing the claims as to Chemetron was properly entered, and second, whether Safety First's liability was properly determined by way of a directed verdict. The damages questions are, first, whether plaintiff's loss of profits claim was properly submitted to the jury; second, whether Pitco, who was first made a party to the action some 15 months after the filing of the initial complaint, should have been held liable for a pro rata share of interest calculated as of the date of the complaint; and third, whether principles of comparative negligence applied to Safety First's contribution claim against Pitco require an allocation of percentage of liability as between them rather than an equal pro rata sharing.
We address first the liability issues. Preliminarily Pitco does not claim that there was insufficient proof to warrant the jury's finding of an actionable defect in its product, the fryer. Its argument is, rather, that since it had not been made a direct defendant by Lee's, its liability is only to Safety First for contribution. Thus, as it correctly contends, if Safety First is not liable to plaintiff, then Pitco would have no liability at all. Pitco therefore argues, as does Safety First, that Safety First was entitled to a directed verdict of dismissal or, in the alternative, that the question of Safety First's liability should have been submitted to the jury. Both Safety First and Pitco also argue that the summary judgment dismissing the action as against Chemetron was erroneously entered and that both therefore are entitled to indemnification from Chemetron or to contribution by it as a third tortfeasor.
Since there is no real dispute as to the existence of the defect in the fryer, we need only address the proofs respecting the alleged defects in the fire suppression system. In this respect, we are satisfied tht Chemetron was improperly let out of the *500 case and that the question of both Chemetron's and Safety First's liability should have been submitted to the jury.
As we understand the record, the fire suppression system was designed to discharge a dry powder with fire extinguishing capability through nozzles strategically placed in the kitchen. The system was, moreover, designed to be triggered by fusible links which would melt when a certain degree of heat was reached. There is apparently no dispute that the system failed to operate and that no powder was released when the oil in the fryer ignited. It is also apparent that the reason for this failure was attributable in some way to the triggering mechanism of the fusible links since the system was able to be triggered manually after the fire.
The precise reason for the failure was not, however, the subject of exact specification. One of the theories advanced at trial, supported by expert testimony, was that there had been an excessive accumulation of grease on the functioning parts of the system which had prevented them from operating properly. Plaintiff also relied on an inference of design or manufacturing defect or both by reason of the fact that the system did not operate in the manner in which it was supposed to and that it had not in any way been interfered with subsequent to its manufacture and installation by it or any other party. A subsidiary factual dispute related to proximate cause. There was a question as to whether Safety First had in fact installed a discharge nozzle over the fryer. If there were no such nozzle, then it may well have been that the system, even if it had properly triggered, would in any event have failed to extinguish or contain a fire ignited by the defective operation of the fryer.
The theory that the grease build-up in the kitchen was the underlying cause of the failure of the triggering mechanism was at the heart of Chemetron's pretrial motion for summary judgment. During the course of pretrial discovery, Safety First's expert had provided a report, which essentially challenged the assertion that the triggering failure had been a *501 proximate cause of plaintiff's damage. It was the expert's opinion that, even if the system had been triggered,
it most probably could not have controlled the fire which was burning up the heavy grease-coated ducts, filters and in the exhaust duct hood. The fire extinguishing system when automatically or manually activated is designed to control a flash fire in the hood system until manual extinguishers or the fire department can be summoned, or the source of the fire can be turned-off (i.e. shutting-off gas supplies, etc.). The dry chemical extinguishing system is not a continuous system, but supplies extinguishing chemical for a relatively short period of time, usually substantially less than one minute. The extinguisher system could not control a raging fire in the duct system leading to the roof, in the writer's opinion, once the fire had headway from below, such as appears to have occurred in the subject case.
It was his further opinion that it was plaintiff's responsibility to keep the system free of grease and cooking-oil residue. It was also his opinion that
a more fully enclosed extinguisher linkage system could have resisted the buildup of cooking grease and oils which accumulated upon components, however, the design and details of the system as manufactured were beyond the control and scope of the installing contractor, Safety First Products of N.J., in the writer's opinion.
The basis of Chemetron's motion was the fact that it had provided Safety First, as part of the system, a special hood which should have been installed by Safety First and which would have protected the system from excessive grease accumulations. The motion judge accepted this argument, concluding that Chemetron was insulated from liability by reason of Safety First's failure to have installed the hood. We are satisfied that the trial judge erred.
It is axiomatic that a motion for summary judgment cannot be granted where there is a genuine dispute as to material fact. R. 4:46-2. And see Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 73-75 (1954). Our review of the record persuades us that there was a sufficient factual dispute as to product defect attributable to the designer and manufacturer to have precluded the grant of summary judgment.
First, we are satisfied that the trial judge misinterpreted the import of Safety First's expert's reference to "a more fully enclosed extinguisher linkage system." It was apparently the *502 motion judge's view that installation by Safety First of Chemetron's hood would have constituted such "a more fully enclosed extinguisher linkage system." We do not so read the expert's report since it is also clearly capable of supporting the inference that the "more fully enclosed linkage system" should have been an integral and internal part of the system itself and not a removable exterior device of questionable utility and effect. Such a reading of the report would clearly create a substantial fact question. Even more significant, however, was the motion judge's willingness to accept the grease accumulation as a cause for the mechanism's failure for which the designer and manufacturer was not responsible.
The record showed that plaintiff had in fact contracted with other parties to remove grease accumulations from the kitchen, from the kitchen equipment, and from the system at regular intervals. Moreover and more importantly, this system was specifically designed and manufactured to function in a commercial kitchen in which the accumulation of grease is not merely foreseeable but is rather virtually unavoidable. Indeed, it was the trial judge's view, with which we agree, that an inference of design defect could be supported on that basis alone. We therefore conclude that there were substantial factual questions based on the record before the motion judge. Should the system have been designed to operate despite grease accumulations? Was it the grease accumulation which caused the failure of the triggering mechanism system? If "a more fully enclosed extinguisher linkage system" would have resisted the excessive accumulation of cooking grease, did the external and removable hood designed and manufactured by Chemetron constitute a reasonable design defense against that consequence? The existence of these factual questions required, in our view, a denial of the motion.
We consider next the directed verdict entered at trial against Safety First. The trial judge, as we have noted, was of the view that the grease build-up in the kitchen was a condition which should have been anticipated in the design and manufacture *503 of the system. He was of the further view that a kitchen operator's failure to adequately remove grease accumulation was also a matter which should have been foreseeable by the designer and manufacturer of the system and which therefore should have been taken into account by it. He was, therefore, of the view that, had the system been properly designed and manufactured, the mechanism would have been triggered and hence that the triggering failure itself created an inference of defect. We agree with the trial judge that such an inference could be supported by the evidence.[2] See Moraca v. Ford Motor Co., 66 N.J. 454, 458 (1975); Ventura v. Ford Motor Corp., 180 N.J. Super. 45, 53 (App.Div. 1981). Our disagreement with the trial judge is only as to the ineluctability of that inference. As we read the record, while the finder of fact could properly have drawn that inference, it would not have been obliged to do so. There were other possible causes for the mechanism failure, including, for example, the possibility of installer negligence and improper maintenance.
With respect to installer negligence, certain further observations must be made. As we have noted, there was a factual dispute as to whether Safety First had installed a discharge nozzle over the fryer. It appears that it was its responsibility to determine the location of nozzles and that, if it had failed to do so, any manufacturing or design defect in the system may not have been a proximate cause of the damage since, even had the system been activated, there would have been no extinguishing powder sprayed on the site of the fire. While a jury question as to proximate cause of a design or *504 manufacturing defect was therefore raised, that question was really irrelevant in the absence of Chemetron as a party since the full responsibility for any defect in the system, whether manufacturing, design or installation, was in any event and by reason of Chemetron's absence wholly attributable to Safety First.
By way of summary on the liability issues, we hold therefore that the questions as to the liability of Chemetron and Safety First should have been submitted to the jury. Consequently, we reverse both the summary judgment in favor of Chemetron and the directed verdict against Safety First. We further point out that on retrial the jury must be required to determine by special interrogatory whether the defect was design or manufacture on the one hand or installation defect on the other hand or both. If the defect was only in design or manufacture, Safety First would be entitled to full indemnification from Chemetron. If the defect was in installation alone, then only Safety First would be liable. If the defect was in both design or manufacture and in installation, then Chemetron and Safety First are severally and jointly liable, and Safety First's right to indemnification rather than merely contribution would apply only to the extent that the defect was design or manufacture.
With respect to the damages issues, we are satisfied, for the reasons stated by the trial judge on the new trial motion, that he properly submitted the issue of loss of profits to the jury and that Pitco was properly charged with a portion of the full interest calculation. See also R. 2:11-3(e)(1)(A), (C) and (E).
The significant damages issue is the method of allocating contribution between the joint tortfeasors, namely, whether they are entitled to pro rata contribution pursuant to the Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-1 et seq., or whether they are entitled to contribution based on their respective percentages of negligence pursuant to the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 et seq. More specifically, *505 the question is whether in the absence of any degree of negligence attributable to plaintiff, the pro rata scheme or the percentage scheme applies as among joint tortfeasors.
Contrary to the view of the trial judge, we are satisfied that the Comparative Negligence Act modifies the pro rata scheme of the Joint Tortfeasors Contribution Law irrespective of whether any percentage of negligence is assigned to plaintiff. It is true that Polyard v. Terry, 148 N.J. Super. 202 (Law Div. 1977), rev'd on other grounds, 160 N.J. Super. 497 (App.Div. 1978), aff'd o.b. 79 N.J. 547 (1979), had held that where zero percentage of negligence is assigned to plaintiff, the joint tortfeasors share the verdict pro rata and not in accordance with the disparate percentages actually allocated to them by the jury. That holding was, however, effectively overruled by Cartel Capital Corp. v. Fireco of New Jersey, 81 N.J. 548, 569-570 (1980), in which the plaintiff was held to be not negligent as a matter of law, and the joint tortfeasors were nevertheless required to share the responsibility for paying plaintiff's damages in accordance with the percentages of negligence attributed to each by the jury. Approving this court's analysis in Rogers v. Spady, 147 N.J. Super. 274 (App.Div. 1977), the Supreme Court in Cartel Capital Corp. has left no doubt that the Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-3, has been modified by the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 et seq., and that as a result of the Comparative Negligence Act joint tortfeasors no longer share on a pro rata basis but on the basis of percentages of negligence assigned by the finder of fact.
It is clear that the effect and intent of the Comparative Negligence Act were not only to accord a fairer result to moderately negligent plaintiffs but also to accord fairer justice to joint tortfeasors by calling upon them to contribute to the award in proportion to their own actual degree of negligence. That is the express mandate of N.J.S.A. 2A:15-5.3. Thus, the Comparative Negligence Act recognizes that it was as unfair for a 10% negligent tortfeasor to bear 50% of the damages as it *506 was for a 10% negligent plaintiff to be denied any recovery at all. We also note that if achieving fairness for joint tortfeasors had not also been a purpose of the Comparative Negligence Act, there would have been no reason for it to base contribution on allocated percentages. It would have been sufficient, had the focus been exclusively on plaintiffs, for a plaintiff's award to be reduced by the percentage of his negligence and to then require joint tortfeasors to contribute to the reduced award on a pro rata basis pursuant to the Joint Tortfeasors Contribution Law.
We are also persuaded that the percentage allocation among tortfeasors dictated by the Comparative Negligence Act applies where, as here, contribution is claimed by a defendant in a separate action. Clearly a defendant's right to contribution from a joint tortfeasor cannot be controlled by plaintiff's unilateral decision not to join all tortfeasors. Therefore, if plaintiff chooses to sue only one joint tortfeasor and that joint tortfeasor is consequently compelled to bring his own contribution action against other tortfeasors, he should in the contribution action be both entitled to and burdened by the same contribution consequences which would have obtained had plaintiff himself sued both tortfeasors.
We therefore hold that irrespective of plaintiff's negligence, a joint tortfeasor's right of contribution, whether asserted by cross-claim or third-party complaint, is to be determined by a percentage allocation pursuant to the Comparative Negligence Act rather than by pro rata contribution pursuant to the Joint Tortfeasors Contribution Law. This jury, therefore, should have been instructed to allocate percentages of liability as between Safety First and Pitco and, on the retrial, must be required to do so as among all defendants, counting, however, Safety First and Chemetron as a single defendant for purposes of allocating liability based on a design or manufacturing defect.
By way of summary of our holdings with respect to damages, we conclude that the total amount of damages awarded *507 to plaintiff was properly arrived at. The amount of damages need not therefore be retried unless Chemetron is also held liable and asserts its right to be heard on that issue. For purposes of expediting the retrial, it should be bifurcated with the liability issues tried first and damages issues tried immediately thereafter. We are also satisfied that the full interest award must be shared by all liable parties in the same manner as the compensatory damages award, namely, by an allocation of percentage of negligence to each defendant.
Based on the foregoing and based on our holdings respecting the liability issues, we reverse all liability determinations as to Chemetron and Safety First, and remand for a new trial for the purpose of determining, consistent with this opinion, the liability of Chemetron and Safety First and the percentage of liability to be allocated among Pitco and to such of the other defendants who may be found to be responsible for plaintiffs' damages.
NOTES
[1] The initial complaint by Lee's also joined two other defendants who allegedly were involved in some aspect of maintaining the fire suppression system. Dismissals were entered against these defendants prior to commencement of trial, and they are in no way involved in this appeal.
[2] We point out again that such an inference was supported by the record before the motion judge. His grant, therefore, of Chemetron's summary judgment motion resulted in the anomaly of the installer of equipment being held liable for a design or manufacturing defect, and the designer and manufacturer being absolved. We note that this anomaly itself may well have entitled Safety First to relief from the interlocutory partial summary judgment pursuant to R. 4:50-1 even if the summary judgment had been properly entered.