870 A.2d 713 (2005)
376 N.J. Super. 420
Peter GRUBBS and Kathy L. Cody, Plaintiffs,
v.
Kenneth C. KNOLL and Diana Knoll, Defendants-Respondents/Cross-Appellants, and
Louis B. Chapman, Esq., Defendant-Appellant/Cross-Respondent, and
Kenneth C. Knoll and Diana Knoll, Third-Party Plaintiffs/Respondents/Cross-Appellants,
v.
Varley & Stevens Realtors, Ltd., and Zoe Stevens, Third-Party Defendants/Respondents, and
Feinman & Chapman, P.A., Third-Party Defendant/Appellant/Cross-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued February 9, 2005.
Decided April 15, 2005.
*716 Scott B. Piekarsky, Saddle Brook, argued the cause for appellants/cross-respondents.
*717 Clark E. Alpert, West Orange, argued the cause for respondents/cross-appellants (Alpert Butler Sanders Norton & Bearg, attorneys; William D. Sanders, of counsel and on the brief).
Leonard Rosenstein, Union, argued the cause for respondents (Vasios, Kelly & Strollo, attorneys; Mr. Rosenstein, on the brief).
Before Judges NEWMAN, R.B. COLEMAN and HOLSTON, Jr.
The opinion of the court was delivered by
NEWMAN, P.J.A.D.
In this fraud/legal malpractice action involving a residential real estate transaction, defendant Louis B. Chapman, Esq., and third-party defendant Feinman & Chapman, P.A., (Chapman) appeal, and defendants Kenneth C. and Diana Knoll (Knolls) cross-appeal, from a counsel fee award of $174,393 against Chapman and in favor of the Knolls.
Both Chapman and the Knolls contend that the trial judge erred in his determination of the overall attorney fee award. Chapman asserts that the award should have been proportionate to the jury's determination of Chapman's percentage of liability which was found to be ten percent. Chapman also argues that the trial court erred in failing to sanction third-party defendants Zoe Stevens and Varley & Stevens Realtors, Ltd. (Stevens) for a discovery violation that had a significant effect on the trial, and in failing to charge the jury on the Knolls' responsibility to mitigate their damages.
On the cross-appeal, the Knolls argue that the trial court erred in ruling that Chapman was not jointly and severally liable for all of the Knolls' compensatory damages including attorneys fees and in denying Knolls' request for an enhancement of the fee award. Except to reverse on holding Chapman responsible for one-third of the attorneys fees and costs incurred in the conduct of the trial, we affirm as to the remaining issues on the appeal and all of the issues raised on the cross-appeal. We also affirmatively hold Chapman 100 percent responsible for the attorney fees and costs in connection with the application for such fees and costs.

I.
On June 30, 1998, plaintiffs Peter Grubbs and his wife Kathy L. Cody (Grubbs) filed a complaint in the Passaic County Special Civil Part against the Knolls and the Knolls' attorney, defendant Louis V. Chapman, seeking the return of certain monies which were placed in escrow in conjunction with a residential real estate transaction between the Grubbs and the Knolls. On October 13, 1998, Judge Scancarella granted the Knolls' motion to transfer the case to the Passaic County Law Division.
On October 16, 1998, the Knolls filed an answer, a counterclaim against the Grubbs, a cross-claim against Chapman, and a third-party complaint against Feinman & Chapman, P.A., Varley & Stevens Realtors, Ltd., and Zoe Stevens. In their counterclaim, the Knolls alleged that the Grubbs had committed fraud by failing to reveal that the property they sold to the Knolls was severely constrained by wetlands. In their cross-claim/third-party complaint, the Knolls asserted that the Stevens defendants had violated the Consumer Fraud Act (CFA), and that the Chapman defendants had committed legal malpractice.
The matter was tried by a jury on various dates in September and October 2001. On October 29, 2001, the jury returned a verdict in favor of the Knolls on their *718 common law fraud, consumer fraud, and legal malpractice claims in the amount of $75,650. The jury also found that the Grubbs on their original complaint were only entitled to the return of one-half of the escrowed monies. The jury allocated sixty percent of liability to Stevens, thirty percent to the Grubbs, and ten percent to Chapman. According to the final judgment entered on December 4, 2001, the Stevens defendants were required, under the CFA, to pay three times the amount of the full verdict ($226,950), plus attorney's fees and costs of suit. Chapman defendants were ordered to pay $7594.45, plus attorney's fees, while the Grubbs were ordered to pay $22,786.34 without any attorney's fees because there was no legal or statutory basis to award such fees against the Grubbs. However, the judgment specified that the Stevens defendants were entitled to a reduction in their obligation in the event of any payment by the Chapman defendants or the Grubbs.
The Knolls subsequently settled with the Grubbs for $20,000, and with the Stevens defendants for $500,000. On December 26, 2001, the Knolls filed an application for an award of attorneys fees solely against the Chapman defendants who did not settle. On January 14, 2002, the Chapman defendants cross-moved for monetary sanctions against the Stevens defendants in lieu of any fee award, in light of Stevens' failure to produce a key document prior to trial.
On August 1, 2002, the trial court awarded the Knolls $523,179 in attorney's fees and costs comprised of the following four items:
(A) $385,344.37 of fees awarded for the underlying lawsuit; plus (B) $57,591.05 of costs/expenses awarded for the underlying lawsuit; plus (C) $68,696.42 of fees awarded for the fee application; plus (D) $11,547.72 of costs/expenses awarded for the fee application.
The judge directed that the Chapman defendants were responsible for one-third of this award, or $174,393. In concluding that the fee should be split in thirds, the trial judge commented that the facts were intertwined. The judge made no mention of apportioning the award consistent with the jury's determination of respective liability even though this was charged to the jury.

II.
Chapman contends that the trial judge erred in apportioning the attorney's fees contrary to the jury's apportionment of liability, in ordering him to pay attorney's fees in an amount that was unreasonably disproportionate to the underlying jury award against him, and in apportioning settlement credit to compensate the Knolls for the attorney's fees they incurred in pursuing their claims against the Grubbs.
In reviewing a trial court's counsel fee determination, appellate courts apply a deferential standard; those determinations" `will be disturbed only on the rarest of occasions, and then only because of a clear abuse of discretion.'" Packard-Bamberger & Co., Inc. v. Collier, 167 N.J. 427, 444, 771 A.2d 1194, 1204 (2001) (quoting Rendine v. Pantzer, 141 N.J. 292, 317, 661 A.2d 1202, 1217 (1995)).
In fixing Chapman's counsel fee obligation, the trial judge initially observed that, while he recognized his obligation to separate out the fee-eligible claims, it could not be ignored that the claims against the Grubbs, Stevens, and Chapman had rested upon intertwined facts. Nonetheless, the judge was satisfied that the wrongdoing of each party was equally difficult for the Knolls to prove. The judge was satisfied that the Knolls had prevailed on all of their major claims and viewed his *719 primary task as one of making the Knolls whole. Thereafter, the judge ruled as follows:
I therefore find that the fair and reasonable way to award legal fees in this case is to allocate the fees on a one-third/one-third/one-third basis. And the amount to be paid by defendant Chapman will therefore depend on the ... total allowable fee and costs that I will fix and may be modified by the amount received by the plaintiffs for legal fees pursuant to the settlement.... Plaintiff received $500,000 in settlement from the Stevens' defendants. Three times the jury verdict is $226,950. Of that $7,565 [is] recoverable from the Chapman defendants, $22,695 is recoverable from the Grubbs' defendants. That leaves $196,690 from the Stevens' settlement as Stevens' share of the jury verdict. Subtracting that from the $500,000 leaves $303,310 to apply to the legal fees of the plaintiffs.
It's noted also that plaintiffs accepted $20,000 in settlement of $22,695 due from the Grubbs ... plus interest and ... some other small amount of money.
....
Of course, one-third of legal fee is allocated to the Grubbs Cody parties because of the circumstances that I've previously enunciated. And of course, we know that no legal fee is recoverable from those parties.
... Thus, under the hypothetical of $480,000 with the plaintiffs receiving more or less $303,000 or not two-thirds of $480,000 the one-third of legal services that would be attributable in that hypothetical to the defendants Chapman would be assessed against Chapman without reduction.
Now if, for example, the $303,000 exceeds two-thirds of that which is found to be a ... reasonable legal fee, then of course, the legal fee assessed against the Chapman defendant would be reduced. For example, if the fair and reasonable legal fee and costs were $390,000, that would amount to a share of $130,000 against each group of defendants. Since the plaintiffs voluntarily settled for an amount which ... totals $303,000 toward legal fees, then the Chapman defendants would be liable for the difference between ... $390,000 and $303,000 or ... $87,000.
The judge made no comment upon the proportionality of the award against Chapman given the limited liability ascribed to him by the jury. Ultimately, following a second hearing, the judge awarded $523,179 in counsel fees, out of which Chapman was directed to pay $174,393.
At the outset, we note that the trial judge mistakenly included the attorney fees and costs incurred in the fee application as part of the total attorney fees and expenses awarded. Because the other parties to the litigation had settled with the Knolls, the subsequent fee/expenses application was necessitated solely by the Chapman defendants. Therefore, the entire cost of fees and expenses in connection with the application should be borne by them. This result would be in accord with Saffer v. Willoughby, 143 N.J. 256, 670 A.2d 527 (1996), which makes attorney fees part and parcel of the consequential compensatory damages. Thus, Chapman would be legally responsible for payment of the $80,244.14 of attorney fees and costs incurred in the fee application proceedings.
With regard to attorney fees and expenses incurred on the trial, certain guiding principles are to be followed which we reiterate. "[A] negligent attorney is responsible for the reasonable legal expenses and attorney fees incurred by a former client in prosecuting the legal malpractice *720 action." Saffer v. Willoughby, supra, 143 N.J. at 272, 670 A.2d at 534. In fixing counsel fees, a trial judge must ensure that the award does not cover effort expended on independent claims that happen to be joined with claims for which counsel is entitled to attorney fees. Ricci v. Corporate Express of the East, Inc., 344 N.J.Super. 39, 48, 779 A.2d 1114, 1120 (App.Div.2001), certif. denied, 171 N.J. 42, 791 A.2d 220 (2002); Chattin v. Cape May Greene, Inc., 243 N.J.Super. 590, 614, 581 A.2d 91, 104 (App.Div.1990), aff'd, 124 N.J. 520, 591 A.2d 943 (1991); 49 Prospect Street v. Sheva Gardens, 227 N.J.Super. 449, 470, 547 A.2d 1134, 1144 (App.Div.1988).
Our Supreme Court has declined to construe New Jersey's various fee-shifting statutes to require proportionality between the damages recovered by a plaintiff and the fees awarded. Szczepanski v. Newcomb Med. Ctr., Inc., 141 N.J. 346, 366, 661 A.2d 1232, 1243 (1995). Nonetheless, the amount a plaintiff recovers in damages is relevant to the determination of whether the fees sought are reasonable. Chattin, supra, 243 N.J.Super. at 616, 581 A.2d at 105 (quoting Riverside v. Rivera, 477 U.S. 561, 574, 106 S.Ct. 2686, 2694, 91 L.Ed.2d 466, 479 (1986)).
In such cases, the trial court's responsibility to carefully review the lodestar fee request is heightened. Szczepanski, supra, 141 N.J. at 366, 661 A.2d at 1243. The court must evaluate "not only the damages prospectively recoverable and actually recovered, but also the interest to be vindicated ... as well as any circumstances incidental to the litigation that directly or indirectly affected the extent of counsel's efforts." Id. at 366-67, 661 A.2d at 1243. The lodestar should be decreased "if the prevailing party achieved limited success in relation to the relief he had sought." Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 23, 860 A.2d 435, 447 (2004) (citing Rendine v. Pantzer, 141 N.J. 292, 336, 661 A.2d 1202, 1227 (1995)).
Against this background, Chapman argues that the trial judge should have directed him to pay only ten percent of the Knolls' attorney's fees in accordance with the percentage of liability assigned to him by the jury.
Chapman correctly contends that the trial judge failed to consider the proportionality of Chapman's fee obligation versus the mere $7500 jury verdict against him. The proportionality issue is exacerbated because the trial judge erroneously charged the jury that the percentage of liability assessed against each defendant would be reflected proportionally to the amount of attorney fees. Firstly, the jury has no responsibility in setting the amount of attorney fees; that is exclusively the court's responsibility. There was no reason to mention attorney fees at all to the jury. Secondly, there was no legal basis to impose attorney fees on the Grubbs; and, therefore, it was misleading to the jury to convey the notion that all three groups of defendants, if held liable could be responsible to pay attorney fees. We do not know if this aspect of the charge factored into the jury's liability determination. None of the parties are arguing that it did. Indeed, none of the parties are seeking a new trial on liability. Under these circumstances the ten percent liability assessment against Chapman strongly suggests that Chapman's responsibility for attorney fees and expenses incurred in the trial should mirror the liability percentage.
We recognize that an attorney's time may substantially exceed the result obtained for the client. Where that is the situation, the attorney is obliged to document the effort. Here, where there were three separate claims against three identifiable *721 groups of defendants, Knolls' attorneys did not isolate the time expended in pursuit of the legal malpractice claim against Chapman, to justify an award of attorney fees disproportionate to the result obtained against Chapman.
Chapman contends that the trial judge erred in denying him the benefit of the excess monies in the Stevens settlement. In view of the fact that the Knolls were not entitled to an award of counsel fees with respect to their independent claims against the Grubbs, Chapman asserts that the trial judge erred in applying the excess settlement monies to offset the fees incurred by the Knolls as a result of the claims against the Grubbs, as opposed to the fees incurred as a result of the claims against Chapman. Of course, the settlement effectuated with Grubbs and Stevens occurred well before the trial judge determined the amount of reasonable attorney fees and costs/expenses incurred in the trial. We discern no basis for Chapman to claim the benefit of the monies paid in the Stevens settlement. There has been no windfall to Knolls' attorney. If anything, there is a shortfall where Chapman is only required to pay attorney fees and costs/expenses incurred in the trial in proportion to the liability percentage assessed against Chapman by the jury. It certainly does not offend the principles of Saffer v. Willoughby that attorney fees are an extension of compensatory damages.
We, therefore, determine that Chapman is responsible to pay attorney fees and cost/expenses incurred in the trial in the amount of $44,293.54 (ten percent of total fees and costs awarded for the underlying lawsuit) and attorney fees and costs/expenses incurred in the fee application proceedings in the amount of $80,244.14 ($68,696.42 for fees plus $11,547.72 for costs/expenses) for a total of $124,537.68, plus the damages award of $7594.45 for a total sum of $132,132.13.

III.
Chapman contends that the trial judge erred in refusing to impose a monetary sanction on Stevens, in lieu of an award of counsel fees to the Knolls, because Stevens failed to produce the 1993 site plan indicating that there were wetlands in the rear of the Knolls' property, prior to trial.
On December 26, 2001, the Knolls filed an application for an award of attorney's fees against Chapman, the only party with whom they had not settled. On January 14, 2002, Chapman cross-moved for monetary sanctions against Stevens in lieu of any fee award in light of her failure to produce the 1993 site plan which indicated that there were wetlands in the rear of the Knolls' property. Chapman argued that it would be more appropriate to compensate the Knolls for their counsel fees in this manner since Stevens' discovery violation, as well as her refusal to make any settlement offer until after the verdict, likely prevented the matter from settling prior to trial. The trial judge, however, denied Chapman's motion on the ground that Stevens had already settled with the Knolls for $500,000 and was no longer in the case.
Trial courts have the "inherent discretionary power to impose sanctions for failure to make discovery." Aetna v. Imet Mason Contractors, 309 N.J.Super. 358, 365, 707 A.2d 180, 183 (App.Div.1998). Such sanctions will be not be disturbed on appeal provided "they are just and reasonable under the circumstances." Ibid. (quoting Hirsch v. General Motors Corp., 266 N.J.Super. 222, 261, 628 A.2d 1108, 1127 (Law Div.1993)).
Spoliation of evidence in a prospective civil action occurs when evidence relevant to the action is destroyed, causing *722 interference with the action's proper administration and disposition. Manorcare Health v. Osmose Wood, 336 N.J.Super. 218, 226, 764 A.2d 475, 479 (App.Div.2001). Whether the spoliator acted negligently or intentionally does not affect the spoliator's liability, but merely is a factor to be considered when determining the appropriate remedy. Ibid. An appropriate remedy may even include an award of counsel fees in exceptional cases, particularly where there is a finding of intentional spoliation and where the non-spoliating party's ability to defend itself was compromised. Id. at 237, 764 A.2d at 485; Aetna, supra, 309 N.J.Super. at 365, 707 A.2d at 183.
Chapman argues that Stevens' failure to produce the site plan and admit to her knowledge of the wetlands notation contained thereon until the second-to-last day of trial amounted to an "effective," if unintentional, spoliation of evidence for which sanctions should have been imposed. At the time Chapman made this argument Stevens had settled and was no longer in the case. Further, even assuming that the trial court could have imposed sanctions upon Stevens, Chapman has conceded that Stevens' discovery violation was not intentional. Chapman's ability to defend himself ultimately was not compromised since the site plan was eventually produced, and he was found liable for only ten percent of the Knolls' damages, due in part to the jury's probable consideration of Stevens' conduct in this regard. As such, and as we noted in Manorcare Health, supra, 336 N.J.Super. at 237, 764 A.2d at 485, counsel fees have never been awarded in a spoliation case. We discern no abuse of discretion by the trial judge's refusal to impose monetary sanctions on Stevens in lieu of counsel fees.

IV.
Chapman contends that the trial judge erred in failing to charge the jury on mitigation of damages. We disagree.
At the jury charge conference, the trial judge indicated that, in his view, there was no issue in the case pertaining to the Knolls' obligation to mitigate their damages. Counsel for Chapman disagreed, and the judge asked him to identify his proofs on this point. Chapman's counsel thereafter suggested that the Knolls could have expeditiously moved for summary rescission, attempted to make better use of the property by at least keeping all of their horses there, or tried to sell it.
In rejecting these points, the trial court noted that Chapman had not presented their own appraisal of the value of the property or identified a realtor willing to list the property or any potential buyers. With respect to better use of the property, the court directed that Chapman was free to argue to the jury that all of the Knolls' horses could have been kept at the property, thereby limiting their damages. Lastly, the court stated that it was too late to bring up rescission for purposes of this trial, and that, in any event, the Knolls still would have had to prove fraud in a rescission proceeding. However, the court did agree to consider, in ruling upon any future fee application, whether the Knolls should have taken such action.
Injured parties have a duty to take reasonable steps to mitigate damages. Ingraham v. Trowbridge Builders, 297 N.J.Super. 72, 82, 687 A.2d 785, 790 (App.Div.1997). The burden of proving facts in mitigation of damages rests upon the defendant. Wade v. Kessler Inst., 343 N.J.Super. 338, 355, 778 A.2d 580, 591 (App.Div.2001), aff'd, 172 N.J. 327, 798 A.2d 1251 (2002); Ingraham, supra, 297 N.J.Super. at 83, 687 A.2d at 791. Where there is no evidence of an unreasonable failure to mitigate, a defendant is not entitled to have the jury instructed on the *723 injured party's obligation to mitigate its damages. Spaulding v. Hussain, 229 N.J.Super. 430, 443-44, 551 A.2d 1022, 1029-30 (App.Div.1988). The reasonableness of the plaintiff's actions is measured by a subjective standard. Covino v. Peck, 233 N.J.Super. 612, 617, 559 A.2d 868, 870 (App.Div.1989).
Although Chapman now renews his contention that the jury should have been instructed on the Knolls' duty to mitigate their damages, Chapman overlooks: (1) that he presented no testimony to rebut Kailo's testimony that the Knolls stood to lose $52,000 from the sale of the property and faced a mortgage deficiency; (2) that he likewise failed to produce a realtor willing to market the property; (3) that he was permitted to argue to the jury that the Knolls could have avoided the boarding fees for their older horse by keeping him on the property; and (4) that a rescission proceeding would not have been substantially less complicated than the instant trial. Chapman's proofs were clearly lacking to require a charge on mitigation. In one instance, the trial court permitted argument on boarding fees for the horses. What Chapman essentially maintains is, that by requiring the Knolls to sell their property, the calculation of damages would have become easier. However, ease of damage calculation has nothing to do with the principle of mitigation. Moreover, the doctrine is viewed from Chapman's point of view, not from the Knolls' perspective which is what the law requires. Id. at 617-20, 559 A.2d at 870-72. The trial court did not err in declining to charge the jury on the Knolls' duty to mitigate their damages.

V.
The Knolls argue, as part of their cross-appeal, that the trial judge erred in ruling that Chapman was not jointly and severally liable for "all of the Knolls' compensatory damages, including attorney's fees," under the theory that, as their attorney in the real estate transaction, he was the "backstop" who should have protected the Knolls from fraud perpetrated by Stevens and the Grubbs. Although the Knolls' argument would theoretically impact upon the allocation of compensatory damages, its practical effect here, given the Knolls' settlement with Stevens, is limited to the trial judge's treatment of attorney's fees since the appeal and cross-appeal focus solely on awardable counsel fees and their allocation.
In rejecting this argument at the final charge conference, the trial judge had this to say:
there was no testimony that a lawyer is a back stop, that the lawyer is the court of last resort on a closing.... [N]obody is saying that his obligation is a higher duty or anything like that than anybody else's, and I  factually that's not supported so I'm not going to do it.
The Knolls now renew their contention that Chapman was jointly and severally liable for all of the compensatory damages. The Knolls cite no authority for their "backstop" theory of legal malpractice liability or for their proposition that a real estate attorney has an affirmative duty to detect and prevent fraudulent conduct by a seller and/or realtor. Cf. Schimenti v. Whitman & Ransom, 208 A.D.2d 470, 617 N.Y.S.2d 742, 742-43 (1994) (affirming dismissal of legal malpractice claim, premised on attorney's failure to investigate and discover fraud and collusion by borrower and senior lienor bank in representing plaintiff as subordinate lienor, where defendant attorney had no reason to believe that investigation was necessary and no duty to anticipate various possible misuses of client's funds). Rather, they merely assert that "[i]t is admitted that Chapman's duty was *724 to protect the Knolls from fraud" given his "role as a `backstop'."
Chapman challenges the Knolls' "backstop" theory, but, like the Knolls, cites no legal malpractice jurisprudence addressing the issue. Instead, Chapman characterizes the "backstop" argument as analogous to the "captain of the ship" doctrine that has been rejected by this court in the medical malpractice setting. See Diakamopoulos v. Monmouth Med. Ctr., 312 N.J.Super. 20, 34-35, 711 A.2d 321, 329-30 (App.Div.1998) (noting that disfavored "captain of the ship" doctrine "suggests imposing vicarious liability on a doctor because of the negligence of others not under the doctor's control or supervision").
While it is true that a duty of protection is inherent in the duty that a real estate attorney owes to his clients, we are not persuaded that an attorney should be viewed as a "backstop" and held jointly and severally responsible for all damages in circumstances like these. Research has not disclosed any case law expressly condemning or endorsing the characterization of a lawyer as a "backstop" in a transactional setting or otherwise. Cf. Conklin v. Hannoch Weisman, P.C., 145 N.J. 395, 421, 678 A.2d 1060, 1073 (1996) (noting that an attorney is not a guarantor of the future and there is usually no such thing as a risk-free deal). Likewise, Chapman's analogy to the "captain of the ship" doctrine is inapt because the Knolls do not contend that Chapman should be vicariously liable for the wrongdoing of Stevens and the Grubbs.
Chapman argues that he could not be jointly and severally liable because "Stevens' fraudulent act of not revealing the Wetlands on the property at issue was unforeseeable." Although Chapman does not challenge the jury's underlying finding of legal malpractice, its award of compensatory damages, or its apportionment of fault, the arguments regarding foreseeability are relevant in addressing whether apportionment of fault among tortfeasors is permissible in the legal malpractice setting. For their part, the Knolls rely primarily upon Blazovic v. Andrich, 124 N.J. 90, 590 A.2d 222 (1991), to bolster their argument for joint and several liability.
In Blazovic, supra, 124 N.J. at 93-94, 590 A.2d at 224, the cause of action arose out of an altercation in the parking lot of a restaurant. The injured plaintiff instituted suit against the individuals who struck him, asserting claims for intentional torts, and the restaurant, based on a theory of negligence in providing inadequate lighting and security. Id. at 94, 590 A.2d at 224. The individual defendants settled with the plaintiff prior to trial. Ibid. At trial, the jury found the restaurant was negligent, the plaintiff was comparatively negligent, and the individual settling defendants were responsible for committing an intentional assault and battery against plaintiff. Ibid.
The issue addressed by the Supreme Court was whether the Comparative Negligence Act required the jury to apportion fault among the plaintiff, the negligent defendant restaurant, and the settling defendants whose fault was based on intentional conduct. Id. at 92-93, 590 A.2d at 223. After a review of the legislative intent and case law interpreting the Comparative Negligence Act, the Court ultimately held that "responsibility for a plaintiff's claimed injury is to be apportioned according to each party's relative degree of fault, including the fault attributable to an intentional tortfeasor." Id. at 107, 590 A.2d at 231.
In reaching this decision, the Court considered and rejected an argument, also advanced by the Knolls here, that apportionment of fault between a negligent defendant (here, Chapman) and intentional *725 tortfeasors (here, Stevens and the Grubbs) could disadvantage a plaintiff "if fault were substantially allocated to intentional wrongdoers who were not financially able to satisfy the judgment." Id. at 110, 590 A.2d at 232. The Blazovic Court rejected that position because it "ignores the principle that the parties causing an injury should be liable in proportion to their relative fault." Ibid., 590 A.2d at 233
The Court in Blazovic considered whether an apportionment of fault between the intentional tortfeasors and the negligent restaurant would dilute the restaurant's duty to prevent altercations in its parking lot, under the rationale of cases precluding defendants from relying upon a plaintiff's comparative negligence in instances where the defendant's duty included the obligation to prevent the plaintiff's self-injurious conduct. Id. at 111, 590 A.2d at 233. After citing that line of cases, the Court "recognize[d] that the reasoning underlying those decisions could appropriately be applied to preclude apportionment of fault between two tortfeasors when the duty of one encompassed the obligation to prevent the specific misconduct of the other." Ibid. (emphasis added).[1] Despite that recognition, however, the Court declined to apply that principle to the restaurant in the case before it:
Based on the record before us, it would be highly speculative to conclude that the causal connection between [the restaurant's] alleged negligence and the combined misconduct of plaintiff and the individual defendants was sufficient to invoke the rationale of Cowan, Suter [v. San Angelo Foundry & Mach. Co., 81 N.J. 150, 406 A.2d 140], and Soronen [v. Olde Milford Inn, Inc., 46 N.J. 582, 218 A.2d 630]. Our view is that the events that allegedly took place in the parking lot neither were sufficiently foreseeable nor bore an adequate causal relationship to [the restaurant's] alleged fault to justify the imposition on [the restaurant] of the entire responsibility for the resultant injury. In this case we adhere to the general principle that liability should be imposed in proportion to fault.
[Blazovic, supra, 124 N.J. at 112, 590 A.2d at 233.]
Following Blazovic, courts have continued to apportion fault between intentional tortfeasors and defendants found liable for negligence despite claims that the negligent defendants were responsible for protecting the plaintiffs from the very harms that they suffered. See Waldron v. Johnson, 368 N.J.Super. 348, 352, 845 A.2d 1287, 1289 (App.Div.) (limiting plaintiff's recovery against Monmouth Mall under Comparative Negligence Act for violent assault at Mall's ATM machine where the attack "was not so foreseeable nor did it bear such a close causal connection to the Mall's slow response to the melee that it should justify imposing upon the Mall the entire responsibility for plaintiff's injuries"), certif. denied, 182 N.J. 139, 861 A.2d 844 (2004); Martin v. Prime Hospitality Corp., 345 N.J.Super. 278, 292, 785 A.2d 16, 24 (App.Div.2001) (plaintiff's sexual assault in hotel was "neither sufficiently foreseeable nor sufficiently related to [defendant hotel's] alleged fault to justify imposing responsibility on [hotel] for all of plaintiff's injuries").
In contrast, we have not found any instances where legal malpractice cases were held to warrant an exception from the Comparative Negligence Act's apportionment of fault under Blazovic. Nor does the Supreme Court's decision in Conklin v. Hannoch Weisman, P.C., supra, relied *726 upon by the Knolls, compel a different outcome. There, the Court held that a jury in a legal malpractice case should not be permitted to consider the plaintiff's conduct as contributory negligence: "In a long series of cases, we have explained that when the duty of the professional encompasses the protection of the client or patient from self-inflicted harm, the infliction of that harm is not to be regarded as contributory negligence on the part of the client." 145 N.J. at 412, 678 A.2d at 1068 (citing Cowan v. Doering, 111 N.J. 451, 468, 545 A.2d 159, 167 (1988)).
The fact that a plaintiff's contributory negligence may not be considered does not rule out an apportionment of fault among tortfeasors under the Comparative Negligence Act under the possible exception discussed in Blazovic. Indeed, the Conklin Court acknowledged that legal malpractice can be one of a number of concurrent causes of harm to a plaintiff. Conklin, supra, 145 N.J. at 420, 678 A.2d 1060 ("there can be any number of intervening causes between the initial wrongful act and the final injurious consequence"). Thus, the Court adopted the "substantial factor" test where "inadequate or inaccurate [legal] advice is alleged as a concurrent cause of harm," meaning that a jury should be instructed to determine whether the lawyer's negligence was "a substantial factor in bringing about the ultimate harm." Id. at 422, 678 A.2d at 1073. Parenthetically, the jury was so instructed here.
The Knolls also argue that they are entitled to unallocated counsel fees from Chapman based upon the "tort of another" theory discussed in In re Niles, 176 N.J. 282, 823 A.2d 1 (2003). Niles arose out of litigation to remove a trustee who breached his fiduciary duties and to restore trust assets wrongfully obtained by that trustee through his exercise of undue influence over the wealthy, mentally ill, elderly woman who had created the trusts. Id. at 286, 823 A.2d at 3. One of several issues addressed by the Court was whether counsel fees could be assessed against the defalcating trustee for the fees incurred by the estate for legal representation of third parties (beneficiaries under the estate and the guardian ad litem) who were required to be named as interested parties and participate in the litigation against the trustee. Ibid.
In deciding whether to impose such fees against the trustee, the Supreme Court considered whether an exception to the "American Rule," "which prohibits recovery of counsel fees by the prevailing party against the losing party," was warranted under the "special circumstances" of the case. Id. at 294, 823 A.2d at 7. One such exception is that "`[a] plaintiff has the right to recover attorney's fees incurred in other litigation with a third person, if he became involved in that litigation as a result of a ... tortious act by the present defendant.'" Id. at 294-95, 823 A.2d at 8 (quoting In re Estate of Lash, 169 N.J. 20, 31, 776 A.2d 765, 771-72 (2001)). Under that rationale, the Court concluded that the trustee's breach of his fiduciary duty rendered him responsible for the "significant damages" incurred by the estate in the form of counsel fees for the estate's beneficiaries and the guardian ad litem:
As a result of [the trustee's] tort, the estate incurred significant damages in the form of counsel fees that were not surcharged against [the trustee or his cohort] as tortfeasors. The counsel fees incurred for representation of those third parties represent consequential damages to the estate proximately caused by [the trustee's] breach of his fiduciary duty. "But for" [the trustee's] tortious conduct, the litigation that was the wellspring from which all counsel *727 fees flowed would not have been necessary. Therefore, it follows that all counsel fees charged to the estate for representation of third parties in the litigation should be reimbursed by tortfeasor [trustee]. To hold otherwise would mean that [the trustee] has shifted a substantial portion of the economic burden of his misdeeds to the victims  the beneficiaries of the trusts.
[Id. at 295-96, 823 A.2d at 8-9.]
Relying upon Niles, the Knolls contend that Chapman's negligence caused their need to litigate with the "defrauding parties" and, as such, he should be responsible for all legal fees incurred by the Knolls in proceeding against Stevens and the Grubbs. The fallacy in the Knolls' attempt to expand Niles is evident from their own description of the situation: they incurred legal fees in "litigation with defrauding parties." The fact that the Knolls were defrauded by Stevens and the Grubbs, and concededly had an independent basis for litigating against them in a separate action, renders this case readily distinguishable from Niles, where the legal fees for representation of estate beneficiaries and a guardian ad litem were solely a function of the trustee's egregious breach of his fiduciary duty.
Dorofee v. Planning Bd. of Pennsauken Tp., 187 N.J.Super. 141, 453 A.2d 1341 (App.Div.1982), also cited by the Knolls, is equally distinguishable. There, a planning board was awarded counsel fees against a codefendant, a seller of real estate, for legal fees incurred in defending itself against claims brought by the plaintiffs, proposed purchasers of property, as a result of fraudulent misrepresentations made by the codefendant to both the purchasers and the planning board. Id. at 145, 453 A.2d at 1343-44. This court observed that, "although attorneys fees are not ordinarily included as damages in a fraud action, one who is forced into litigation with a third party as a result of another's fraud may recover from the tortfeasor the expenses of that litigation, including counsel fees, as damages flowing from the tort." Id. at 144, 453 A.2d at 1343. Here, in contrast, there is no contention that Chapman engaged in fraud. The litigation against Stevens and the Grubbs was the direct result of their intentional tortious conduct, not a "forced" outcome of Chapman's negligence.
To apply Niles in the manner advocated by the Knolls would effectively create a new theory of fee-shifting, at odds with the prevailing "American Rule," applicable to any negligent defendant who is argued to be the first actor in a chain of successive tortious events causing a unitary injury. For example, the Knolls' position would appear to require the defendant restaurant in Blazovic, supra, to bear the legal fees incurred by the injured plaintiff in proceeding against the intentional tortfeasors who assaulted him since, but for the inadequate lighting and security, the plaintiff would arguably not have had need to litigate with those tortfeasors.
To the extent the Knolls' argument might only be deemed applicable to attorney negligence cases under their "lawyer as backstop" theory, it implicates a dramatic expansion of the fee-shifting created by our Supreme Court, pursuant to its constitutional rule-making power, in Saffer v. Willoughby, supra. See Niles, supra, 176 N.J. at 298, 823 A.2d at 10 (noting that fee-shifting rule of Saffer in legal malpractice cases was authorized by the Court's exclusive authority under the New Jersey Constitution to engage in rule-making). Such an expansion of Saffer is beyond the authority of this court and better left to the Supreme Court. In re Farnkopf, 363 N.J.Super. 382, 396, 833 A.2d 89, 97-98 (App.Div.2003). Moreover, since the *728 Knolls can, and have, recouped the bulk of their counsel fees from Stevens by virtue of the Consumer Fraud Act, it would appear that the concern which prompted the Saffer Court to authorize fee-shifting in legal malpractice cases, i.e., making the client whole, is not present here.
The Knolls also rely heavily upon Cogar v. Monmouth Toyota, 331 N.J.Super. 197, 751 A.2d 599 (App.Div.2000), in challenging the trial court's allocation of counsel fees. In Cogar, supra, 331 N.J.Super. at 202-03, 751 A.2d at 602-03, multiple defendants were found liable under the CFA, with fault being apportioned in varying degrees against them. Counsel fees were awarded under the CFA, but the trial court rejected the defendants' request to apportion those fees according to each defendant's percentage of liability and instead held that the defendants were jointly and severally liable for the attorneys' fees awarded to the plaintiff. Id. at 203, 751 A.2d at 602. On appeal, this court also rejected apportioning fees in accordance with the defendants' respective percentages of liability under the CFA, notwithstanding prior case law holding that: (1) jointly liable defendants whose CFA liability is less than 60% are only required to pay that percentage of the treble damages awarded; and (2) responsibility for interest is to be apportioned among defendants according to their percentage of negligence. Id. at 210-11, 751 A.2d at 607 (citing Gennari v. Weichert Co. Realtors, 148 N.J. 582, 609, 691 A.2d 350, 367 (1997); Lee's Hawaiian Islanders, Inc. v. Safety First Prods., Inc., 195 N.J.Super. 493, 507, 480 A.2d 927, 934 (App.Div.), certif. denied, 99 N.J. 205, 491 A.2d 703 (1984)).
This court's denial of fee apportionment in Cogar was holding faithful to the legislative intent under the fee-shifting provision of the CFA to "encourage attorneys to take small claims in order to serve the important public policy behind the statute." Cogar, supra, 331 N.J.Super. at 211, 751 A.2d at 607. We determined that, "impos[ing] a limitation on the amount of fees recoverable based on allocation would dilute the significant policy underpinnings of the fee provision of the legislation." Ibid.
Here, the policy underlying the CFA's fee-shifting provision is neither diluted nor undercut by the apportionment issue raised by the Knolls because Chapman's obligation to pay counsel fees is not derived from the CFA. Put another way, inasmuch as the Knolls voluntarily settled all aspects of their claims against the only party who was responsible to them for statutory attorney's fees under the CFA, Cogar should not be read as divesting the trial judge of discretion in fashioning an appropriate fee award against the lawyer-defendant once the CFA was no longer a factor in the case.
Indeed, Cogar reaffirms that, notwithstanding the policies of the CFA, trial judges retain discretion to reduce counsel fee awards in view of a plaintiff's settlement with other parties. Specifically, as we ruled in Cogar, the trial court did not abuse its discretion by reducing the counsel fee award under the CFA against the remaining defendants by one-third of the amount that plaintiff received from a settling defendant. Id. at 210-11, 751 A.2d at 607. Nothing in Cogar divests the trial judge of discretion in fashioning an equitable apportionment of counsel fees to be paid by Chapman upon the settlement of the CFA claims against Stevens.
The trial judge did not err in ruling that Chapman was not jointly and severally liable for all of the Knolls' compensatory damages, including attorney's fees.

VI.
The Knolls contend that the trial judge erred in denying their motion for an enhancement of the fee award.
*729 In denying the Knolls' request for a fee enhancement, the court ruled as follows:
Additionally, while I've found that there's very little difference between the policy in the Consumer Fraud Act and the policy of making the plaintiff whole in Saffer, that principle does not also apply necessarily through enhancement of a fee in a legal malpractice case. And that['s] ... just what I'm left with by reason of the settlement made by the plaintiffs with two of the ... three groups of defendants.
The attorneys should receive fair and reasonable compensation for their services but not a fee enhancement under these circumstances.
And also, in making that finding I did carefully review the material pertaining to the condition of the Sanders' law firm and considered that in making this decision.
"New Jersey has a strong policy against the shifting of counsel fees." In re Niles, supra, 176 N.J. at 293, 823 A.2d at 7 (citing Packard-Bamberger & Co. v. Collier, supra, 167 N.J. at 440, 771 A.2d at 1201-02). That policy is reflected in our state's adherence to the so-called "American Rule," which "prohibits recovery of counsel fees by the prevailing party against the losing party," except for the few situations specifically permitted by statute, by our Supreme Court through case law or court rule, or by contract. Id. at 294, 823 A.2d at 7; Packard-Bamberger, supra, 167 N.J. at 440, 771 A.2d at 1201-02; In re Farnkopf, supra, 363 N.J.Super. at 395, 833 A.2d at 97. The three-fold purpose of the "American Rule" is to provide unrestricted access to the courts for all persons, ensure equity by not penalizing parties for exercising their right to litigate a dispute, and allow for administrative convenience. In re Niles, supra, 176 N.J. at 294, 823 A.2d at 7-8 (citing In re Estate of Lash, supra, 169 N.J. at 43, 776 A.2d at 779 (Verniero & LaVecchia, JJ., dissenting)).
In Saffer v. Willoughby, supra, 143 N.J. at 272, 670 A.2d at 534, the Supreme Court created an exception to the "American Rule" applicable to legal malpractice cases, holding that "a negligent attorney is responsible for the reasonable legal expenses and attorney fees incurred by a former client in prosecuting the legal malpractice action" because those fees and expenses are "consequential damages that are proximately related to the malpractice." The rationale of Saffer was thereafter extended to claims against attorneys for intentionally violating fiduciary duties. Packard-Bamberger, supra, 167 N.J. at 442-43, 771 A.2d at 1203. The Court emphasized that the exception from the "American Rule" set forth in Saffer and Packard-Bamberger was "warranted to `assure that the client be placed in as good a position as if the attorney had performed properly.'" Niles, supra, 176 N.J. at 297, 823 A.2d at 9 (quoting Packard-Bamberger, supra, 167 N.J. at 443, 771 A.2d at 1203).
The Knolls acknowledged that neither Saffer nor Packard-Bamberger authorizes the enhancement of a prevailing malpractice plaintiff's legal fees through the use of a multiplier. In arguing that the trial judge should have granted an enhancement of the fee award, the Knolls instead rely upon Rendine v. Pantzer, supra, where our Supreme Court considered the statutory fee-shifting provision of the Law Against Discrimination ("LAD"), N.J.S.A. 10:5-27.1 (permitting an award of a "reasonable attorney's fee" to the prevailing party in a discrimination action).
The Rendine Court prefaced its analysis of the enhancement issue by noting its intent to be "faithful to the Legislature's objective in enacting fee-shifting provisions," such as those found in LAD, the *730 CFA, CEPA, the Franchise Practices Act, and the New Jersey Antitrust Act, as well as in certain federal statutes. 141 N.J. at 317, 661 A.2d at 1217. The Court observed that the enactment of these fee-shifting statutes represented a policy choice by the State Legislature and Congress to enable private litigants to retain counsel to vindicate statutory rights in court:
The problem of unequal access to the courts in order to vindicate congressional policies and enforce the law is not simply a problem for lawyers and courts. Encouraging adequate representation is essential if the laws of this Nation are to be enforced. Congress passes a great deal of lofty legislation promising equal rights to all.
Although some of these laws can be enforced by the Justice Department or other Federal agencies, most of the responsibility for enforcement has to rest upon private citizens, who must go to court to prove a violation of law.... But without the availability of counsel fees, these rights exist only on paper. Private citizens must be given not only the rights to go to court, but also the legal resources. If the citizen does not have the resources, his day in court is denied him; the congressional policy [that] he seeks to assert and vindicate goes unvindicated; and the entire Nation, not just the individual citizen, suffers.
[Id. at 323, 661 A.2d at 1219-20 (citation omitted).]
After a lengthy analysis of federal case law addressing "contingency enhancements in determining a reasonable fee under federal fee-shifting statutes," the Rendine Court held that trial courts, "after having carefully established the amount of the lodestar fee, should consider whether to increase that fee to reflect the risk of nonpayment in all cases in which the attorney's compensation entirely or substantially is contingent on a successful outcome." Id. at 334, 337, 661 A.2d at 1226, 1228. In sum, the Court "concluded that a counsel fee award under a fee-shifting statute cannot be `reasonable' unless the lodestar, calculated as if the attorney's compensation were guaranteed irrespective of result, is adjusted to reflect the actual risk that the attorney will not receive payment if the suit does not succeed." Id. at 338, 661 A.2d at 1228 (emphasis added).
More recently, our Supreme Court, reflecting on the CFA, reiterated the legislative policy undergirding statutory fee-shifting provisions:
In a consumer fraud action, the Legislature has recognized that the right of access to the courts is meaningless unless the injured party has the resources to launch a suit. Fee-shifting provides an incentive to competent counsel to undertake high-risk cases and to represent victims of fraud who suffer relatively minor losses.
[Furst v. Einstein Moomjy, Inc., supra, 182 N.J. at 21, 860 A.2d at 446.]
The Furst Court also posited that the provision for attorney's fees in the CFA is "one of the deterrent aspects of the legislation." Id. at 24, 860 A.2d at 448.
In arguing that fee enhancement is necessary in legal malpractice cases to ensure that "competent counsel [are] available to represent this class of plaintiffs," the Knolls seek to invoke the rationale of Rendine and its progeny. The policies underlying the statutory fee-shifting provisions considered in Rendine and Furst are very different from the damages-based consideration that prompted the exception to the "American Rule" carved out by our Supreme Court in Saffer. The fee-shifting provisions of statutes such as the LAD and the CFA express a legislative intent to encourage private plaintiffs to vindicate *731 statutorily created rights and enable them to retain competent counsel in doing so. In furtherance of that legislative policy, courts have determined that the "reasonable attorney's fee" authorized by fee-shifting statutes can include an enhancement of the lodestar fee to take into account the risk of nonpayment where the representation is undertaken on a contingency basis.
In contrast, Saffer's judicially created fee-shifting was not based on a legislative policy of attracting competent counsel to vindicate express legislative or congressional policy. Nor was it based on a statutory entitlement to a "reasonable fee" that might justify application of a multiplier in furtherance of legislative goals of ensuring access to the courts. Instead, the Saffer Court determined that an award of legal fees and expenses incurred by the prevailing plaintiff in a common law legal malpractice action was a necessary component of damages in order to make the plaintiff whole. In re Niles, supra, 176 N.J. at 297, 823 A.2d at 9-10 (citing Packard-Bamberger, supra, 167 N.J. at 443, 771 A.2d at 1203); Saffer v. Willoughby, supra, 143 N.J. at 271-72, 670 A.2d at 534-35.
The enhancement of a legal fee award sought by the Knolls would go well beyond Saffer's rationale of making legal malpractice plaintiffs whole, and would implicate important public policy questions such as, whether fee enhancements are really necessary and appropriate to attract competent counsel to undertake the prosecution of legal malpractice claims. In this regard, it is also worth noting that the Knolls' attorney did not take this case on a contingency basis. Such far-reaching public policy decisions, which could presumably impact on the terms and rates of malpractice insurance coverage in this state, are better left to the Supreme Court. See Van Natta Mechanical Corp. v. DiStaulo, 277 N.J.Super. 175, 186, 649 A.2d 399, 405 (App.Div.1994) (declarations about extending New Jersey's public policy are "better left to the Supreme Court").
In the final analysis, the constitutional authority for the fee-shifting authorized by Saffer is derived from the Supreme Court's rule-making authority. A decision to expand Saffer by granting enhancements of attorney's fee awards in legal malpractice cases would exceed the authority of this court. See Farnkopf, supra, 363 N.J.Super. at 396, 833 A.2d at 97-98 (rejecting argument that counsel fees could be shifted to Salem County Office on Aging and declining to expand fee-shifting principles of Niles and Lash on ground that only Supreme Court possesses necessary constitutional rule-making authority to do so).
We, therefore, reject the Knolls' contention that the trial judge erred in denying their motion for a fee enhancement.
Except to remand to amend paragraph four of the judgment entered on August 1, 2002 to reflect a judgment against defendant Louis V. Chapman and third-party defendant Feinman & Chapman in the amount of $124,537.68 for which they shall be jointly and severally liable and to amend further paragraph five to enter final judgment in favor of the Knolls and against defendant Louis V. Chapman and third-party defendant Feinman & Chapman P.A., jointly and severally, nunc pro tunc as of October 29, 2001, in the total sum of $132,132.13 which is the sum of $124,537.68 plus the $7594.45 judgment entered on December 4, 2001, the judgment is otherwise affirmed on both the direct and cross-appeals.
NOTES
[1] The Court has more recently characterized this portion of the Blazovic opinion as dictum. Frugis v. Bracigliano, 177 N.J. 250, 279-80, 827 A.2d 1040, 1057 (2003).