751 A.2d 599 (2000)
331 N.J. Super. 197
Michelle J. Roepke COGAR, Plaintiff-Respondent,
v.
MONMOUTH TOYOTA and Steven Maglio, Defendants-Appellants, and
T & R Motors, Thomas Scibeck, All-Star Leasing Systems, Kathleen Conklin, Tom's Ford, Inc. Credit Acceptance Corp., Roy Rafe and Lee Colefield, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued March 29, 2000.
Decided May 25, 2000.
*600 William J. Garces, Plainfield, for defendant-appellant Steven Maglio (Garces and Grabler, attorneys; Robert H. Goodwin, on the brief).
Resa T. Drasin, for defendant-appellant Monmouth Toyota (Woehling & Freeman, attorneys; Ms. Drasin, on the brief).
Ronald L. Lueddeke, Spring Lake, for plaintiff-respondent.
Before Judges CARCHMAN, LEFELT and LINTNER.
The opinion of the court was delivered by CARCHMAN, J.A.D.
This appeal requires us to address, among other issues, the question of whether multi-defendant liability under the Federal Odometer Law (FOL), 49 U.S.C.A. §§ 32701-32711, is joint and several or individual and separate. The trial judge concluded that such liability was individual and separate; we disagree, reverse and conclude that such liability is joint and several. We further conclude that consistent with the Supreme Court's decision in Wanetick v. Gateway Mitsubishi, 163 N.J. 484, 750 A.2d 79 (2000), on a retrial of this matter, the trial judge should instruct the jury as to the ultimate outcome of both a finding of liability on the FOL claim as well as plaintiff's claim for damages pursuant to the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 to -91 (CFA).
These are the facts adduced during the jury trial of plaintiff's cause of action. On October 28, 1993, plaintiff Michelle J. Roepke Cogar and her husband purchased a 1986 Buick Regal from defendant T & R Motors. Plaintiff was informed that the vehicle had low mileage of approximately 46,000 miles because it had been owned by an elderly woman whose husband had died. In fact, the vehicle had originally been owned by defendant Steven Maglio, *601 who commuted, using the Buick, from Hazlet, New Jersey to New York City every other week for a period of six years. In 1992, he negotiated a trade-in of the vehicle with defendant Monmouth Toyota, receiving a trade-in value of $1000. When Maglio traded in the car, Monmouth Toyota inquired about the accuracy of the mileage. Maglio responded that the mileage was accurate stating: "Yes, it has to be. Whatever's on the clock has to be, has to be the mileage." The Monmouth Toyota salesman later told Maglio that mechanics had inspected the car and questioned whether the odometer accurately reflected the number of miles on the car. In fact, when Monmouth Toyota's mechanic, Kevin Andreach, inspected the vehicle he wrote, "Horrible, life threatening to drive," and, accordingly, refused to take the car for a test drive. Maglio indicated that he "[n]ever had cause to" look at the odometer while he owned the car. He admitted signing an odometer disclosure statement for the Buick along with at least a "dozen" other documents at the time of the trade-in, but indicated he did not really understand all the papers he signed.
Approximately a year after he traded in the Buick, someone called Maglio to inquire about its mileage:
And he said well, was the mileage, I think he said, I think I said 37,000. And I said I don't think so, it doesn't sound like enough because I had the car for a while. He said could it have been 137. And I said that sounds more likely, sounds more reasonable. I said why don't you just look at the clock and it will tell you how many miles are on it.
And he said that the clock was showing 37. He said was it possible that the clock could be going around a second time. And I didn't know what he meant. And he explained to me that on some cars it doesn't show the 100,000 miles. That the clock goes around twice and I didn't know that.
Maglio indicated that after this conversation he looked at the odometer disclosure statement and realized it was wrong because it indicated that the Buick had approximately 37,000 miles on it when he traded it in to Monmouth Toyota.
Approximately a week after purchasing the car in 1993, plaintiff received advice from a family friend who indicated that the Buick had significantly more than the 46,000 miles which showed on the odometer and had been represented to her by T & R Motors as the amount of mileage on the car. T & R Motors, through one of its owners, defendant Tom Scibeck, and an employee, defendant Lee Colefield, told plaintiff that they would return her deposit if she could prove that the car had more than 46,000 miles on it. Plaintiff obtained "proof" in the form of a report from a mechanic; however, when presented with this report, T & R Motors refused to return the deposit.
Plaintiff attempted, unsuccessfully, to return the car one more time. At that same time, she learned that T & R had obtained the car from defendant Tom's Ford.
Plaintiff drove the car for approximately two weeks after she purchased it but then stopped driving it because she "did not feel safe" as the "car was smoking terribly," and the doors were difficult to close. Additionally, she could not register it because she refused to pay the balance of the deposit. She subsequently had the car towed to the State Police in Bordentown for inspection where it remained for four months.
The vehicle's chain of title was determined as a result of an investigation by the State Police. The results of the investigation were as follows: Steven Maglio purchased the vehicle with 15 miles on it in 1986; Monmouth Toyota then received the title on November 6, 1992, with a represented 37,464 miles; Allstar Leasing Systems acquired it on December 4, 1992, with 37,473 miles; Kathleen Conklin then obtained title to it on December 22, 1992, with 37,700 miles; Tom's Ford next assumed *602 title to it in October 1993, with 46,600 miles; and T & R Motors received it with 46,623 miles. After conducting an investigation, Sergeant O'Malley of the State Police concluded that "the odometer had actually rolled over once to where all zeros appeared on the odometer." He additionally concluded that either Maglio or Monmouth Toyota was responsible for the incorrect representation regarding the mileage.
The car remained in plaintiff's parents' yard for four years. She did not drive it, but it was insured for two of those years. During that period, plaintiff rented cars and secured transportation from friends. She purchased another car within a month; however, that car was unreliable, and she claimed that she did not have use of any car for a total of sixty-six days. Plaintiff made only two loan payments to the company which had financed the purchase of the vehicle.
On April 21, 1994, plaintiff filed a complaint against defendants alleging violations of both the CFA and FOL together with a claim for breach of contract. The matter proceeded to trial at which time plaintiff's expert concluded that when he inspected the car, he determined that it was unsafe and likely had been driven well over 100,000 miles, perhaps as many as 145,000 miles. He opined that "anybody with automobile knowledge would have known immediately that this car couldn't possibly have such low mileage." Monmouth Toyota's mechanic, indicated, however, that to determine the actual mileage of the car would be pure speculation, and he did not recall whether or not he had thought the car had significantly more mileage than reflected by the odometer when he had inspected the car in 1992.
The jury held all defendants liable. Specifically, in response to jury interrogatories, the jury found that T & R Motors breached its contract with plaintiff. Additionally, the jury found that all defendants violated both the CFA and FOL, which proximately caused plaintiff's loss. It allocated the comparative responsibility of each defendant as follows: Maglio, 0%; Monmouth Toyota, 35%; T & R Motors, 25%; Roy Rafes, 25%; Lee Colefield, 5%; defendant Tom's Ford,[1] 10%. The jury awarded damages in the amount of $6,231.
Post-judgment, the trial judge found that both the CFA and FOL require "the trebling of compensable damages" and an award of counsel fees to successful plaintiffs. In a written opinion, he concluded that under the CFA, "plaintiff may only recover a total of three times her compensable damages" irrespective of the number of defendants found responsible. However, the trial judge further concluded that "each defendant found by the jury to have violated the Federal Odometer Law is individually responsible to plaintiff in the sum of $18,693."
The judgment in favor of plaintiff amounted to $6,231, reduced by ten percent (Tom's Ford, Inc.'s settlement) and trebled under the CFA to $16,823.70. Each defendant was liable in the amount of their percentage of fault.[2] Each defendant was also held individually liable for compensatory damages of $6,231, trebled under the FOL to $18,693 for a total award to plaintiff under this count of $56,079. Additionally, counsel fees in the amount of $28,328.40 were awarded under both statutes although the judge refused to apportion the counsel fees according to each defendant's percentage of liability, holding defendants jointly and severally liable for the fee amount. Additionally, costs of $1,813.45 were awarded. In sum, as a result of the jury's finding of $6,231 in actual compensatory damages, plaintiff received *603 $56,079 after reduction and trebling under the CFA and FOL; together with counsel fees of $28,328.40, and costs of $1,813.45.
Both Maglio and Monmouth Toyota appeal and raise similar issues. Both urge that the trial judge erred in concluding that the FOL mandated separate and individual liability urging that any liability should be joint and several rather than separate and individual. Additionally, they argue that the trial judge was obligated to instruct the jury as to the ultimate outcome of its verdict also challenging the form of the verdict sheet presented to the jury during its deliberations. Finally, Monmouth Toyota challenges the judge's failure to apportion the attorneys' fees awarded to plaintiff.

I
We commence our analysis with a discussion of the FOL. The FOL imposes civil liability on those who tamper with car odometers or fail to accurately disclose the mileage of vehicles. 49 U.S.C.A. §§ 32701-32711. In promulgating the FOL, Congress recognized the heavy reliance of a buyer "on the odometer reading as an index of the condition and value of a vehicle;" "as an accurate indication of the mileage of a vehicle;" and "in deciding on the safety and reliability of the vehicle." 49 U.S.C.A. § 32701(a)(1)-(3). To accomplish its objectives, the FOL requires "a person transferring ownership of a motor vehicle [to] give the transferee a written disclosure(A) of the cumulative mileage registered by the odometer; or (B) that the mileage is unknown if the transferor knows that the mileage registered by the odometer is incorrect." 49 U.S.C.A. § 32705(a)(1)(A)-(B).
The operative provision of the FOL relevant to the issue on appeal is 49 U.S.C.A. § 32710(a), which provides:
A person that violates this chapter or a regulation prescribed or order issued under this chapter, with intent to defraud, is liable for 3 times the actual damages or $1,500, whichever is greater.
In interpreting this provision, various courts are of two minds as to whether the liability is separate and individual or joint and several. Some courts support the former view. See, e.g., Ferris v. Haymore, 967 F.2d 946, 956-57 (4th Cir.1992); Alley v. Chrysler Credit Corp., 767 F.2d 138, 141-42 (5th Cir.1985); Saber v. Dileo, 723 F.Supp. 1167, 1167-68 (E.D.La.1989); Mataya v. Behm Motors, Inc., 409 F.Supp. 65, 70 (E.D.Wis.1976); Majcher v. Laurel Motors, Inc., 287 Ill.App.3d 719, 223 Ill.Dec. 683, 680 N.E.2d 416, 428-29 (1997). Other courts support the latter position. See, e.g., Rice v. Gustavel, 891 F.2d 594, 596-97 (6th Cir.1989); Roberts v. Robert V. Rohrman, Inc., 909 F.Supp. 545, 553-54 (N.D.Ill.1995); Yowell v. Boyd Chevrolet, Inc., 504 F.Supp. 77, 78 (W.D.Okla. 1980); Duval v. Midwest Auto City, Inc., 425 F.Supp. 1381, 1388-89 (D.Neb.1977), aff'd, 578 F.2d 721 (8th Cir.1978); Slaymaker v. Westgate State Bank, 241 Kan. 525, 739 P.2d 444, 453-55 (1987); Chapotel v. Bailey Lincoln-Mercury, Inc., 363 So.2d 451, 453-54 (La.1978).
Those courts that have adopted the view that the statute imposes separate and individual liability focus primarily on the language of the statute setting forth that "a person" in the chain of title bears liability. The reasoning is simply stated:
The statute provides that "[a]ny person" [3] who fraudulently violates its provisions "shall be liable" for" three times the amount of actual damages sustained or $1,500, whichever is the greater." 15 U.S.C. § 1989(a)(1). The statute thus not only provides to victims of odometer fraud a cause of action against each violator of the statute but also expressly *604 provides that each violator will be liable for treble or statutory damages.
[Ferris, supra, 967 F.2d at 956.]
The Fourth Circuit in Ferris also observed that
each fraudulent transfer of an automobile is a separate violation of the federal odometer statute. Joint and several liability applies only where multiple defendants are responsible for a single tort, not where multiple defendants have each committed a separate tort. In any event, when Congress has intended to impose joint and several liability rather than separate and individual liability, it has so provided explicitly.
[Id. at 956-57 (citations omitted).]
The Fifth Circuit, adopting the reasoning in Ferris, has also found liability to be individual, concluding that "where separate odometer statements were issued, each issuer is subject to separate and individual liability under the Act." Alley, supra, 767 F.2d at 142; see also Saber, supra, 723 F.Supp. at 1167-68.
The Sixth Circuit has adopted a contrary view. In Rice, supra, the court observed:
By providing that "any person" shall be liable, the statute allows the purchaser to sue not only the immediate seller but any other persons in the chain of the title who may have been involved in the fraud. The fact that each such person shall be liable, however, does not necessarily preclude the conclusion that liability is to be joint and several, rather than separate and individual.
[Rice, supra, 891 F.2d at 596.]
An appropriate analysis of the issue can be found in Duval, supra, where the district court in Nebraska analyzed both the statute and its purpose:
The policy of the odometer statute is both to "prohibit tampering with odometers on motor vehicles and to establish certain safeguards for the protection of purchasers ..." 15 U.S.C. § 1981. The goal of deterring those tempted to turn back odometers, which is encompassed within the purpose of prohibiting tampering, is effected in several ways: Having a minimum civil liability of $1,500.00 payable to a victim; tripling the actual damages if that results in more than $1,500.00; allowing of civil penalties payable to the United States of up to $1,000.00 for each violation of the Act on suit by the Attorney General (15 U.S.C. § 1990b); providing for criminal penalties (U.S.C. § 1990c); authorizing inspections, investigations and administrative proceedings by the Secretary of Transportation for the enforcement of the statute (15 U.S.C. §§ 1990d and 1990e); and injunctive relief (15 U.S.C. § 1990).
[Duval, supra, 425 F.Supp. at 1388.]
The court went on to conclude:
The array of techniques for controlling violators or potential violators militates against a holding that each violator should be required to pay the full judgment and not receive a diminution of his liability by reason of payment by another. If the statute depended entirely or primarily upon the civil liability provision to deter incipient violators, or if the civil liability provision were not itself punitive, the argument for requiring each violator to pay without benefit of credit for payment by another would be stronger.
All in all, I am unable to find that legislative history or policy would justify a judicially declared exception to the rule quoted from the Restatement that payment by one tortfeasor diminishes the amount of the claim against another tortfeasor on account of the harm for which each is liable.

[Id. at 1388-89.]
In concluding that liability was joint and several, the court referenced the general rule expressed in the Restatement:[4]
*605 A payment by any person made in compensation of a claim for a harm for which others are liable as tortfeasors diminishes the claim against the tortfeasors, at least to the extent of the payment made, whether or not the person making the payment is liable to the injured person and whether or not it is so agreed at the time of payment or the payment is made before or after judgment.
[Restatement (Second) of Torts, § 885(3) (1979).]
We conclude that the more sound view is that liability is joint and several rather than individual. We agree with the reasoning of the district court in Duval that nothing is found in the legislative history of the statute to suggest that liability should be anything other than joint and several; moreover, while we recognize the punitive objective of the statute, that objective is served by a trebling of the damages rather than providing a windfall to a successful plaintiff. In this case, plaintiff established damages approximating $6000, and defendants are liable for that amount together with an additional $12,000 as a result of the punitive trebling. We seriously doubt that Congress intended a damaged plaintiff to recover an additional $36,000 for a total recovery of $54,000 on a proven damage claim of $6,000, with such multiple recovery a function of the number of culpable prior owners in the chain of title. Indeed, "since there was but one harm there can be but one satisfaction." Aljian v. Ben Schlossberg, Inc., 8 N.J.Super. 461, 467, 73 A.2d 290 (Law Div.1950).
The New Jersey Supreme Court has noted that the trebling of damages represents a legislative civil punishment of offenders, where as a matter of policy such punishment is appropriate. See Lettenmaier v. Lube Connection, Inc., 162 N.J. 134, 139, 741 A.2d 591 (1999) (noting that one of the three purposes of the Consumer Fraud Act is "to punish the wrongdoer through the award of treble damages"); Cox v. Sears, Roebuck & Co., 138 N.J. 2, 21, 647 A.2d 454 (1994) ("Although one purpose of the [Consumer Fraud Act] is clearly remedial in that it seeks to compensate a victim's loss, the Act also punishes the wrongdoer by awarding a victim treble damages, attorneys' fees, filing fees, and costs."). The use of treble damages as an appropriate punitive measure appears in other contexts where the Legislature has concluded that certain statutory violations warrant the doubling or trebling of damages. See, e.g., N.J.S.A. 46:8-21.1 (providing that a tenant who successfully demonstrates to a trial court that a landlord wrongfully withheld his security deposit is entitled to "double" the amount of the deposit); N.J.S.A. 58:10-23.11f (stating that a discharger of hazardous waste who fails to comply with a directive to clean up such waste "shall be liable to the department in an amount equal to three times the cost of such cleanup and removal"). Application of separate and individual liability distorts any punitive scheme suggested by legislation. The geometric increase in punitive impact results simply as a function of the number of owners in the chain of title. The punitive civil liability provisions cannot be allowed to become draconian through an application which bears little relevance to the true intent of the statute. We conclude that the trial judge erred in applying a rule which imposed separate and individual liability and find that the appropriate rule is one of joint and several liability.

II
Both defendants assert that the trial judge erred by failing to instruct the jury as to the ultimate outcome as to both the CFA and the FOL. During his instructions to the jury, the trial judge made no mention of the impact of its award and the ultimate responsibility of the parties regarding the award.
*606 At trial, Monmouth Toyota requested that the trial judge instruct the jury as to "ultimate outcome" in order to inform them that under both the CFA and FOL any damages awarded would be trebled and that plaintiff would be awarded counsel fees and costs. The judge reserved decision on this request, and ultimately refused to instruct the jury that any damages they awarded would be trebled. After retiring for deliberations, the jury asked two questions of the court: 1) "What is to be included, for example, legal fees and the amount of money which will fairly and reasonably compensate the plaintiff?" and 2) "To what amount are we limited?" Monmouth Toyota again requested the court to instruct the jury as to the ultimate outcome of its award, which request the judge again refused. The jury proceeded to award plaintiff $6,231 in compensable damages, which the judge appropriately trebled.
At the time of trial, the issue of whether to inform the jury that any damages it awarded under the CFA would be trebled had not been resolved in New Jersey. Indeed, the Model Jury Charges-Civil, 4.23 at 16-17, as they existed at the time of trial, noted that no New Jersey court had directly addressed the issue, explaining the two differing viewpoints that had emerged on the question and stating that the Committee on Model Civil Jury Charges took "no position on the question." Compare Semke v. Enid Auto. Dealers Ass'n, 456 F.2d 1361, 1370 (10th Cir.1972) (noting in an antitrust case that the court should not have advised the jury that its award would be trebled), with Roman v. Mitchell, 82 N.J. 336, 345-47, 413 A.2d 322 (1980) (holding that "a jury in a comparative negligence situation should be given an ultimate outcome charge so that its deliberations on percentages of negligence will not be had in a vacuum, or possibly based on a mistaken notion of how the statute operates").
The Supreme Court has recently settled the conflict and has determined that trial judges are to instruct juries as to the ultimate outcome of their verdicts under the CFA. Wanetick v. Gateway Mitsubishi, 163 N.J. 484, 750 A.2d 79 (2000). The Court affirmed our holding that an ultimate outcome charge was required under these circumstances. In so holding, we stated:
In enacting the Consumer Fraud Act, the Legislature, presumably reflecting the contemporary morality of our citizens, recognized that fraud in the marketplace is particularly pernicious because of the wide disparity between the bargaining power of the merchant and the consumer. As a result, it built into its remedy a punitive damages component via treble damages and attorneys' fees. It is fair to say that this sense of outrage over marketplace fraud is potentially present in every case in which a Consumer Fraud Act violation is alleged. Thus, jurors, like the Legislature, may well believe that something more than making the consumer whole is warranted. It is important therefore for the jury to know that its purely compensatory award will trigger an automatic punitive remedy. This will insure that the jury's sense of outrage will not be reflected either in its assessment of compensation or in some other aspect of the case.
[Wanetick v. OCT Partnership, 318 N.J.Super. 156, 165, 723 A.2d 100 (App.Div.1999), aff'd in part and rev'd in part, 163 N.J. 484, 750 A.2d 79 (2000).]
The Supreme Court agreed, concluding that "jurors sitting in a consumer fraud case should be informed of the legal effect of their actions so that their deliberations `will not be had in a vacuum, or possibly based on a mistaken notion of how the statute operates.'" Wanetick, supra, 163 N.J. at 494, 750 A.2d 79 (quoting Roman v. Mitchell, 82 N.J. 336, 345, 413 A.2d 322 (1980)). This reasoning and result apply with equal force to the FOL as the ultimate impact of any award is the same as that of the CFA. The punitive intent of *607 the FOL is consistent with that of the CFA and the result should be no different.
Finally, we recognize that in Wanetick the Supreme Court stated that the requirement of an ultimate outcome instruction is prospective in application; however, since this matter must be remanded for trial, the trial judge should instruct the jury as to the ultimate outcome of both the CFA and FOL.

III
Lastly, defendants claim that the trial judge erred in refusing to apportion the counsel fees according to each defendant's percentage of liability, and also for failing to reduce the fee amount by the percentage of fault allocated to the defendant who settled. We conclude that the trial judge did not err in failing to apportion the fees and further did not err in reducing the fees by one-third of the Ford settlement. Defendants assert that Gennari v. Weichert Co. Realtors, 148 N.J. 582, 691 A.2d 350 (1997) should be logically extended to require that counsel fees are apportioned according to the percentage of fault determined by the jury. In Gennari, the Supreme Court held that those jointly liable defendants whose liability is less than sixty percent are only required to pay that percentage of treble damages awarded under the CFA. Id. at 609, 691 A.2d 350. Defendants assert that this principle should be extended to an award of counsel fees under the FOL and CFA. Plaintiff contends, however, that the Supreme Court's silence on this issue indicates no desire on its part to apportion fees accordingly. Plaintiff also states that apportioning fees would not promote the goals of either statute because it would be contrary to the legislative policy of encouraging attorneys to take cases that involve only small losses.
In support of their position, defendants note that we have found that responsibility for an award of interest should be apportioned among defendants according to their percentage of negligence. Lee's Hawaiian Islanders, Inc. v. Safety First Prods., Inc., 195 N.J.Super. 493, 507, 480 A.2d 927 (App.Div.), certif. denied, 99 N.J. 205, 491 A.2d 703 (1984).
We are of the view that the fees should not be apportioned according to percentage of liability. We have previously observed that the provision for attorneys' fees under the CFA is mandatory as a result of the legislation's intent to encourage attorneys to take small claims in order to serve the important public policy behind the statute. Wisser v. Kaufman Carpet Co., 188 N.J.Super. 574, 579, 458 A.2d 119 (App.Div.1983). To now impose a limitation on the amount of fees recoverable based on allocation would dilute the significant policy underpinnings of the fee provision of the legislation.
As for defendants' claim that the counsel fees should be reduced by the percentage of the settling defendant's liability, we conclude that the trial judge did not abuse his discretion by reducing the counsel fee award by a percentage of the settlement with Tom's Ford.
We reverse and remand this matter for a new trial in accordance with this opinion.
NOTES
[1] Tom's Ford, Inc. settled with plaintiff prior to trial.
[2] For purposes of the FOL, defendants T & R Motors, Roy Rafes and Lee Colefield were considered one defendant and therefore were collectively, jointly and severally liable to plaintiff for the total sum. No one challenges this determination.
[3] The statute has been amended to state that "a person" who violates the statute is liable, rather than "any person." This statutory amendment does not change our decision in this case.
[4] The Duval court cited the first version of the Restatement, which was current at the time. Although the language and phrasing was changed in the second Restatement, the principle remains the same.