**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3233-17T2

RODNEY FREENEY,

     Plaintiff-Respondent,

v.

GUY J. CARNAZZA,
CINEMACAR LEASING, INC.
and CINEMACAR II, INC.,

     Defendants-Appellants,

and

LAMBROS MOTITIS, KILLER
CARZ, LLC and SAM SANKAR,

     Defendants.

_____

Argued telephonically May 30, 2019 – Decided June 18, 2019

Before Judges Hoffman and Geiger.

On appeal from Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-5178-14.

Thomas A. Lodato argued the cause for appellants (Alampi & DeMarrais, attorneys; Thomas A. Lodato, on the briefs).

Andrew R. Wolf argued the cause for respondent (The Wolf Law Firm, LLC, attorneys; Lisa R. Bouckenooghe, on the brief).

PER CURIAM

Appellants Guy J. Carnazza, Cinemacar Leasing, Inc. (Cinemacar Leasing), and Cinemacar II, Inc. (Cinemacar) appeal from a Law Division order awarding plaintiff Rodney Freeney attorney's fees and costs pursuant to N.J.S.A. 56:8-19, the fee-shifting section of the Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -20. We affirm.

I.

In August 2012, plaintiff and his uncle travelled to defendant Killer Carz, LLC (Killer Carz) to inspect a 2006 Acura TL with an advertised sales price of $12,900. Plaintiff expressed interest in purchasing and financing the Acura. Plaintiff made a $500 down payment and signed a payment receipt. The sales representative also offered plaintiff a vehicle service contract, which plaintiff accepted. Plaintiff did not receive or sign any document at the sales lot, other than the down payment receipt. Plaintiff then completed a credit application and was denied. He was

2

referred to defendant Lambros Motitis, a representative of defendant Cinemacar to obtain financing for the purchase of the Acura.

Upon plaintiff's arrival at Cinemacar, Motitis arranged the financing through an agreement whereby Capital One Auto Finance would accept assignment of a Retail Installment Sale Contract (RISC) between Cinemacar and plaintiff. Motitis prepared the RISC, the agreement was executed, and it was assigned to Capital One Auto Finance. A down payment of $3500 was agreed upon. Motitis provided plaintiff with a Bill of Sale that stated a sales price of $15,000; sales tax of $1190; "Doc Prep Fee" of $345; "Tag & Title Fee" of $250; and a "Svc Contract/Warranty" for $2000. The Bill of Sale stated the total price was $18,785, a down payment of $3500 had been paid, and a balance of $15,285 remained.

The RISC prepared by Motitis listed the amount financed as $15,285; a finance charge of $4761.72; a down payment of $3500; and a total sale price (inclusive of down payment) of $23,546.72. The RISC itemized the financed $15,285 as follows: (1) the outstanding balance for the purchase of the vehicle of $12,690,[1] plus (2) the total other charges paid to others on the plaintiff's behalf, in

---

[1] $15,000 paid to Cinemacar, for the Acura at Killer Carz, plus $1190 in sales tax, for a total sale price of $16,190, minus the $3500 down payment, yielding an unpaid balance of $12,690.

the amount of $2595, comprised of the $2000 service contract fee to "AUL Administrators," $250 "Government Certificate of Title Fees," and a $345 "Doc Prep Fee" paid to Cinemacar II.  The sales price reflected in the RISC was thus $2100 greater than the $12,900 price stated in the Killer Carz advertisement.

Plaintiff then returned to Killer Carz to pay the remainder of the down payment before travelling to Cinemacar.  The next day, Cinemacar issued a 30-day temporary license plate for the Acura.  The temporary tag displayed Cinemacar's dealer identification number, despite Killer Carz still holding title to the Acura. Plaintiff took possession of the Acura the same day.

When plaintiff subsequently attempted to pick up his license plates and registration from Killer Carz, he was asked to pay $300 despite the RISC indicating $250 for official government title fees.  As a result, he went to Cinemacar to collect his plates and registration.  Cinemacar paid $46.50 to the Motor Vehicle Commission (MVC) for plaintiff's registration, $85 to the MVC for plaintiff's title, and $5 to the MVC for plaintiff's temporary plates.[2]  The total cost of $136.50

_____

[2] The receipt from the MVC only indicates the registration and title fees, but at the time, the agency charged dealerships $5 for a temporary license plate issued to a New Jersey resident.

A-3233-17T2

differed from $250 charge by $113.50. Plaintiff did not receive a refund. Neither the Bill of Sale nor the RISC itemized the $345 document preparation fee.

The RISC was assigned to Capital One on September 5, 2012. Capital One paid $14,995 to Cinemacar Leasing[3] for assignment of the RISC, and charged Cinemacar a $295 "Dealer Fee" in conjunction therewith. At this time, however, Cinemacar did not hold title to the vehicle.

Plaintiff alleged Cinemacar obtained title through the following process. About a month after the purchase, Cinemacar submitted a "Reassignment of Certificate of Ownership by New Jersey Car Dealership" to the MVC, which stated Cinemacar purchased the Acura from Killer Carz the same day. Six days later, Cinemacar filed a "Reassignment of Certificate of Ownership by New Jersey Car Dealership" that stated Cinemacar sold the Acura to plaintiff on October 4, 2012.

Plaintiff never received a valid service contract. He alleged defendants did not remit the funds necessary to purchase the service contract from a third-party for which plaintiff was charged $2000. In June 2013 the Acura developed transmission troubles and was towed. Plaintiff then learned he did not have a valid service contract and that Auto Service of America, Killer Carz's service contractor, and AUL

---

[3] Plaintiff's amended complaint alleges Capital One paid Cinemacar Leasing, yet appellants argue Cinemacar Leasing was not involved in this transaction.

A-3233-17T2

Administrators, the company listed on the RISC, did not have the Acura's Vehicle Identification Number in their systems, nor any processed paperwork. The Killer Carz sales representative who sold plaintiff the Acura claimed he did not process the service contract because plaintiff owed still $300. Another Killer Carz representative informed plaintiff that Cinemacar was responsible for processing the service contract. Plaintiff paid for the transmission repairs out-of-pocket.

Plaintiff retained counsel and filed suit against defendants. The 135 paragraph, four count amended complaint alleged numerous violations of the CFA; the Truth-in-Consumer Contract, Warranty, and Notice Act, N.J.S.A. 56:12-15 (TCCWNA); the Automotive Sales Practices Regulations (ASP Regulations), N.J.A.C. 13:45A-26B.1 to -26B.4; and the Motor Vehicle Advertising Practices Regulations (MVAP Regulations), N.J.A.C. 13:45A-26A.4(a)(1). Plaintiff alleged he suffered an ascertainable loss comprised of: (1) the $2100 difference between the advertised sale price and the final sale price; (2) the overcharge for the title and registration fees; (3) the unitemized $345 documentation preparation fee; (4) the $2000 charge for the service contract plaintiff never received; (5) the amount financed that plaintiff remains obligated to pay; (6) the damages caused by the knowingly false statements filed with the MVC; and (7) the out-of-pocket repair costs due to the lack of a service contract.

A-3233-17T2

Plaintiff alleged defendants' fraudulent activity included: (1) fraudulently representing that Cinemacar was selling a vehicle to plaintiff and inducing him to obtain financing when Cinemacar did not hold title to that vehicle; (2) filing documents with the MVC that contained knowingly false statements, including inaccurate odometer readings and representations of sales that never took place, causing plaintiff's title to contain false and unreliable information thereby reducing the resale value of the vehicle; (3) charging plaintiff $2100 more than the advertised price in violation of the bait-and-switch prohibitions in the MVAP Regulations; (4) charging plaintiff $2000 for a service contract without providing any such coverage; (5) overcharging plaintiff for MVC fees and charging an unitemized documentary service fee in violation of the ASP Regulations; and (6) unlawfully allowing a business to use the licenses of another individual or business to sell vehicles and offer credit. Plaintiff sought joint and several liability against defendants for monetary relief, including treble damages available under the CFA, statutory and actual damages under the TCCWNA, declaratory and injunctive relief, and reasonable attorney's fees and costs as authorized by those statutes.

Defendants Carnazza and Cinemacar filed an answer with defenses and cross-claimed for contribution and indemnity from the remaining co-defendants under common law and the Joint Tortfeasors Contribution Act, N.J.S.A. 2A:53A-1 to -48,

7

and the Comparative Negligence Act, N.J.S.A. 2A:15-51 to -58. Killer Carz did not answer the complaint and plaintiff filed a request to enter default against them.

On December 3, 2014, plaintiff sent a settlement offer, inclusive of attorney's fees and costs, to counsel for defendants Cinemacar and Carnazza. The offer was not accepted. Shortly thereafter, the court issued a Mediation Referral Order appointing a mediator.

In early 2015, counsel for defendants Cinemacar and Carnazza relayed the existence of another necessary party to plaintiff's counsel. This led to plaintiff filing an amended complaint naming Sam Sankar, Motitis, and Cinemacar Leasing as additional defendants. Defendants Sankar and Motitis did not answer the amended complaint and plaintiff entered default against them.

The parties engaged in substantial pretrial discovery. Plaintiff served interrogatories, requests for production of documents and deposition notices on appellants, but did not receive timely responses. Killer Carz, Sankar, and Motitis (collectively, the Killer Carz defendants), requested plaintiff's consent to vacate default against the Killer Carz defendants. Plaintiff granted the request and served interrogatories and a document demand on each of the Killer Carz defendants.

Plaintiff subsequently moved to extend discovery and compel depositions of appellants. On October 1, 2015, plaintiff withdrew his motion to compel depositions

and the court entered an order extending the discovery end date to January 11, 2016. On the same day, plaintiff sent counsel for all defendants a global settlement demand inclusive of attorney's fees and costs.

On October 6, 2015, plaintiff moved to compel appellants to answer plaintiff's interrogatories and document demands, or in the alternative, to suppress their answers. The court entered an order compelling appellants to provide discovery responses by a date certain.

Thereafter, the mediation conducted by the court-appointed mediator was unsuccessful. Plaintiff then moved to compel the Killer Carz defendants to answer interrogatories and provide documents, or in the alternative, to suppress their answer. The court entered an order suppressing the answer filed by the Killer Carz defendants without prejudice. At the same time, plaintiff served all defendants with requests for admissions.

On December 22, 2015, plaintiff moved to suppress the appellants' answer for failing to abide by the prior order compelling discovery responses by a date certain. While the motion was pending, appellants served plaintiff with responses to discovery, an opposition to plaintiff's motion, and a motion to extend the discovery end date. Plaintiff subsequently withdrew the motion to suppress the answers of appellants. However, the Killer Carz defendants remained delinquent in answering

9

discovery. On February 2, 2016, the trial court granted plaintiff's motion to suppress the answer filed by the Killer Carz defendants with prejudice.

Following several adjournments, trial was ultimately scheduled for May 16, 2016. Leading up to trial, plaintiff discussed settlement with appellants several times without success. Moments before trial was to begin, plaintiff reached a settlement agreement as to damages with all defendants. The terms of the settlement were set forth in a handwritten agreement signed by all parties. The agreement provided:

> 1) By no later than May 27, 2016 Defendants shall pay Rodney Freeney $6,000 via a check made payable to him and delivered to the Wolf Law Firm. If the payment is not received by May 27, 2016, Plaintiff shall be entitled to obtain an entry of judgment against Defendants in the sum of $13,500.
>
> 2) After payment is received, Plaintiff will file a motion for an award of attorney's fees and costs. Defendants agree to pay the amount awarded by the Court, and Defendants shall not contest Plaintiff's counsel's entitlement to reasonable attorney's fees and costs but may contest the reasonableness of the time and rates.

After the settlement was reached, plaintiff's joint counsel filed a fee application, which appellants opposed. The application stated The Wolf Law Firm expended a total of 90.9 hours billed at the rate of $310 to $710 per hour, yielding a lodestar (Time Spent x Hourly Rate) of $36,357.50. The firm incurred costs and expenses totaling $2359.69. Co-counsel Christopher J. McGinn expended 35.9

10

hours at an hourly rate of $460 for a total of $16,514. Plaintiff also sought a lodestar enhancement.

Appellants did not object to plaintiff's entitlement to an award of reasonable attorney's fees and costs under the settlement agreement. Notably, appellants did not object to the hourly rates sought or the time entries claimed by plaintiff's counsel. Instead, appellants limited their opposition to reducing the fee award to an amount proportionate to the conduct attributable to them, which they claim was no more than "failing to itemize the motor vehicle fees charged to plaintiff." In that regard, appellants asserted they were not liable for the conduct alleged in counts three and four. They further claim they became involved only after plaintiff's initial credit application was denied. Appellant's opposing papers admit that the sale they "completed" "included a twelve month, twelve thousand mile service warranty" effective September 1, 2012.

The trial court granted plaintiff's motion for attorney's fees and costs on June 22, 2017. In its written opinion, the court framed the issue as "whether a prevailing plaintiff under a multi-defendant . . . settlement is entitled to all of its fees from a solvent settling party, under a theory of joint and several liability, or whether each defendant should bear the burden of costs for the claims against it." First, the judge analyzed whether the settlement agreement was an enforceable contract capable of

11

binding each settling defendant to all fees incurred. The court found the agreement did not expressly "ascribe to [any defendant] the joint liability asserted by plaintiff [nor the] several liability asserted by defendant." Accordingly, the court was "constrained to allocate costs based upon general principles of law." To that end, the court concluded, "the nexus between the fee award and the litigation is determined neither by the amount of recovery, nor the percentage of liability, but ought to reflect the costs of pursuing the claims against each and all defendants." The court stated it was "obvious . . . that defendant Killer Carz would likely have been solely responsible for counts three and four, and the trier of fact would have determined if either, neither, or both defendants were responsible for counts one and two." After noting the settlement agreement was silent as to allocation of liability or responsibility for payment of legal fees, the court determined the reasonable costs imposed under the statue by analyzing "the costs attendant to commencing and maintaining the litigation against each and every party." The court concluded:

> For those costs solely attributable to Killer Carz, they should be severally liable, and no costs should be imposed on [Cinemacar]. For those costs solely attributable to [Cinemacar], they should be severally liable, and no costs should be imposed on Killer Carz. An example of several liability would be for communications solely with one defendant, which would not have any direct relevance to, or impact on, the other parties to this litigation.

> For those costs that cannot be fairly segregated to be attributable to either defendant solely, they shall be allocated to all defendants, and each party should therefore be jointly and severally liable for such costs. An example of such costs would be for the preparation and research of the complaint, and all costs of litigation and settlement. Although arguably [Cinemacar and Cinemacar Leasing] may have played no role in counts III and IV, the entire complaint had to be prepared, filed and litigated. Much like the duty to defend versus the duty to indemnify, to the extent that a party is alleged to have violated a fee-shifting statute, until such time as those allegations are dismissed against it, it would be jointly and severally liable for such costs as may be reasonably necessary to prosecute the claims asserted.

With regard to the hourly rates sought, the trial court determined the rates charged were "within the upper limit of what the court finds reasonable." The court reasoned that, since the hourly rates charged were "well above median rates, the lodestar enhancement frequently used to compensate for risk of non-payment" was reflected in the rates charged. Thus, as there was no "significant issue of difficulty in the underlying litigation," the lodestar enhancement was denied.

The order granted the following attorney's fees and costs: (1) $854.00 against defendants the Killer Carz defendants; (2) $1190.00 against defendants Carnazza, Cinemacar Leasing, and Cinemacar; and (3) $53,187.19 against all defendants jointly and severally.

13

This appeal followed. The Killer Carz defendants did not join in the appeal. Appellants concede plaintiff is entitled to an award of reasonable attorney's fees and costs, but argue the attorney's fees awarded were disproportionate to the amount of the settlement and did not address the respective liability of the defendants.

## II.

Our review of a trial court's fee award is limited. A.W. v. Mount Holly Twp. Bd. of Educ., 453 N.J. Super. 110, 118 (App. Div. 2018). "A reviewing court should not set aside an award of attorneys' fees except 'on the rarest occasions, and then only because of a clear abuse of discretion.'" Garmeaux v. DNV Concepts, Inc., 448 N.J. Super. 148, 155 (App. Div. 2016) (quoting Rendine v. Pantzer, 141 N.J. 292, 317 (1995)). "An abuse of discretion in the award of counsel fees may be demonstrated 'if the discretionary act was not premised upon consideration of all relevant factors, was based upon consideration of irrelevant or inappropriate factors, or amounts to a clear error in judgment.'" Heyert v. Taddese, 431 N.J. Super. 388, 444 (App. Div. 2013) (quoting Masone v. Levine, 382 N.J. Super. 181, 193 (App. Div. 2005)).

"The CFA is a remedial statute which encourages its use by, among other things, reasonably compensating those who prevail through fee shifting." Garmeaux, 448 N.J. Super. at 159 (citing Coleman v. Fiore Bros., Inc., 113 N.J. 594,

598 (1989)). "[T]he CFA's fee-shifting provision advances the statute's policy of ensuring that plaintiffs with bona fide claims are able to find lawyers to represent them and encourages counsel to take on private cases involving an infringement of statutory rights." Id. at 156 (citing Coleman, 113 N.J. at 598). Prevailing CFA plaintiffs are entitled to reasonable attorneys' fees because of the "strong legislative policy in favor of fees both to make whole the victims of consumer fraud and to deter unconscionable practices." Coleman, 113 N.J. at 599 n.1.

"When fee shifting is permissible, a court must ascertain the 'lodestar'; that is, the 'number of hours reasonably expended by the successful party's counsel in the litigation, multiplied by a reasonable hourly rate.'" Garmeaux, 448 N.J. Super at 159 (quoting Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 386 (2009)). First, the trial court "should evaluate the rate of the prevailing attorney in comparison to rates 'for similar services by lawyers of reasonably comparable skill, experience, and reputation' in the community." Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 22 (2004) (quoting Rendine, 141 N.J. at 337). "Second, a trial court must determine whether the time expended in pursuit of the 'interests to be vindicated,' the 'underlying statutory objectives,' and recoverable damages is equivalent to the time 'competent counsel reasonably would have expended to achieve a comparable result. . . .'" Ibid. (alteration in original) (quoting Rendine, 141 N.J. at 336). If the trial court finds

15

"that the hours expended 'exceed those that competent counsel reasonably would have expended to achieve a comparable result, a trial court may exercise its discretion to exclude excessive hours from the lodestar calculation.'" Szczepanski v. Newcomb Med. Ctr., Inc., 141 N.J. 346, 367 (1995) (quoting Rendine, 141 N.J. at 336). Third, the trial court should decrease the lodestar if the plaintiff achieved only limited success in relation to the relief sought. Furst, 182 N.J. at 23 (citing Rendine, 141 N.J. at 336).

"The trial court's responsibility to review carefully the lodestar fee request is heightened in cases in which the fee requested is disproportionate to the damages recovered." Szczepanski, 141 N.J. at 366. "However, there need not be proportionality between the damages recovered and the attorney-fee award itself." Furst, 182 N.J. at 23 (citing Rendine, 141 N.J. at 336). When the fees sought are disproportionate to the damages recovered, "the trial court should evaluate not only the damages prospectively recoverable and actually recovered, but also the interest to be vindicated in the context of the statutory objectives, as well as any circumstances incidental to the litigation that directly or indirectly affected the extent of counsel's efforts." Szczepanski, 141 N.J. at 366-67.

Appellants elected not to challenge the hourly rates sought by plaintiff's counsel. They also did not object to any specific hours expended or services

16

performed as being unnecessary, duplicative, or otherwise excessive. The party opposing a counsel fee application must identify specific areas of factual dispute in a contested fee application, rather than a generalized objection. Chattin v. Cape May Greene, Inc., 243 N.J. Super. 590, 615 n.8 (App. Div. 1990). Instead, appellants limit their argument to the disproportionality of the fee award to the amount of the settlement, and the claimed failure to apportion responsibility for the fees in accord with the respective responsibility of the parties.

Our review of the record reveals that unlike in many instances, plaintiff did not achieve limited success in relation to the relief sought. None of plaintiff's claims were dismissed pretrial. Indeed, appellants did not move to dismiss any of plaintiff's claims. Moreover, the settlement reached did not allocate responsibility between appellants and the Killer Carz defendants.

Our review further reveals that plaintiff's counsel did not engage in prolix or repetitious legal maneuvering, unnecessary discovery, or unsuccessful motion practice. On the contrary, some of the motion practice is directly attributable to appellants' failure to timely provide discovery. We further note appellants moved to extend discovery.

Despite plaintiff's proposed settlement offers and participation in court-ordered mediation, defendants rejected those attempts to resolve the matter until the

morning of trial, when the settlement agreement was reached. This course of action required plaintiff to complete discovery and prepare for trial. In addition, this litigation served not only to vindicate plaintiff's rights under the CFA, but also to deter defendants and other used car dealers from engaging in deceptive sales practices and failing to provide service warranties required by the sales contract.

In assessing appellants' argument that the fee award is disproportionate to the settlement amount, we are mindful the trial court declined to award a lodestar enhancement because of the hourly rates awarded. Ordinarily, the trial court "should consider whether to increase [the lodestar] fee to reflect the risk of nonpayment in all cases in which the attorney's compensation entirely or substantially is contingent on a successful outcome." Rendine, 141 N.J. at 337. Such "contingency enhancements in fee-shifting cases ordinarily should range between five and fifty-percent of the lodestar fee, with the enhancement in typical contingency cases ranging between twenty and thirty-five percent of the lodestar." Id. at 343. The trial court noted the hourly rates claimed were at the upper end of reasonableness and counterbalanced that observation by declining to award the lodestar enhancement.

We find no merit in appellants' argument that the trial court erred by not allocating the fee award in relation to the respective liability of the defendants. Cogar v. Monmouth Toyota, 331 N.J. Super. 197, 211 (App. Div. 2000). Plaintiff's

18

damage claims were settled as to all defendants without allocation of fault. The "denial of fee apportionment" is "faithful to the legislative intent under the fee-shifting provision of the CFA to 'encourage attorneys to take small claims in order to serve the important public policy behind the statue.'" Grubbs v. Knoll, 376 N.J. Super. 420, 446 (App. Div. 2005) (quoting Cogar, 331 N.J. Super. at 211). The imposition of "a limitation on the amount of fees recoverable based on allocation would dilute the significant policy underpinnings of the fee provision of the legislation.'" Ibid. (quoting Cogar, 331 N.J. Super. at 211).

Appellants claim their role in the sales scheme was limited, and they are not liable for the claims asserted in counts three and four of the amended complaint. It is clear, however, that they were the seller of the vehicle according to the MVC documents. The RISC that they prepared included provision of the service warranty. Moreover, even if we accepted appellants' argument their role in the underlying transaction was limited as compared to the Killer Carz defendants, we concur with the trial court's finding that, with few exceptions, the services rendered by plaintiff's counsel were necessary to pursue "the 'interests to be vindicated,' the 'underlying statutory objectives,' and recoverable damages." Furst, 182 N.J. at 22 (quoting Rendine, 141 N.J. at 335-36).

A-3233-17T2

In sum, the trial court properly considered the claims made, the results obtained, the time records submitted by counsel, and the relevant factors in reaching its decision. We find no clear abuse of discretion or error in judgment by the trial court. Accordingly, we discern no basis to disturb the trial court's ruling.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3233-17T2